*Ex parte* BLAIR M'CLENACHAN.

A man in declining circumstances, who makes conveyance to his childern to the prejudice
of his creditors, is excluded from the benefit of the acts of insolvency.

BLAIR M'CLENACHAN having been surrendered by his special bail,
and given security agreeably to the act of assembly, passed on the 4th
April 1798, 4 Dall. St. Laws, 269, applied by petition to this court,
at the last March term, for the benefit of the acts made for the relief of
insolvent debtors.

The creditors then moved that the hearing should be postponed on
account of the absence of a material witness, who had been subpœnaed,
and who had promised to attend, who was in possession of letters,
written by the petitioner, tending to show concealment of his property.
This was at length assented to, on the creditors of the petitioner agree-
ing by their counsel not to issue any *capias ad satisfaciendum* against
him in the meantime, and the matter was continued until the 17th June
last, when the judges would return from the spring circuit.

At which time the hearing proceeded, and Blair M'Clenachan on
his oath declared in substance as follows ; that in the month of December
1795, he purchased divers promissory notes of Robert Morris and John
Nicholson, to the amount of 138,500 dollars, for cash at 7*s*. 6*d*. and
6*s*. 6*d*. in the pound *;* that in January and February 1796, he pur-
chased in company with general Walter Stewart, his son-in-law, the
further sum of 279,340 dollars of these notes, at 11*s*. 3*d*. in the pound,
for the discharge whereof he gave his own notes, indorsed by Stewart,
payable when Morris's and Nicholson's notes became due ; that in
March or April 1796, he purchased 12,000 dollars more of these notes,
for cash at 6*s*. 6*d*. in the pound ; and in December 1796, the further
sum of 182,000 dollars, at 2*s*. 4*d*. in the pound, which he paid for in
insurance company shares ; that he entered originally *into* this specu-
lation of notes for the benefit of his children and kept the notes for
their use until the month of October 1796, when he delivered them up
to his children, indorsed by himself, but kept no memorandum of the
times of his making such indorsements thereon to them ; that some
time in the same month, finding the concerns of the partnership where-
in he was engaged with Patrick Moore embarrassed, but before he knew
of the great difficulties in the affairs of Morris and Nicholson, he con-
tracted with his children to exchange houses, lots and lands, for the
notes in their hands, amounting to 234,000 dollars, and in pursuance
thereof on the last day of the same month, he conveyed all his real es-
tate to a considerable value to his children, excepting a house and lot in
Middletown and a tract of land in Nippenose Valley,(which he retained

for the purpose of being considered a freeholder,) and some landed property, which he transferred to John H. Houston and Alexander James Dallas, in trust of the use of his creditors. Previous hereto, notes of the petitioner and of M'Clenachan and Moore had been protested in the three city banks, to the amount of 60,939 dollars and 72 cents, but he denied having any knowledge of the protests at the time of making the conveynaces to his children. It appeared, that on the 24th October 1796, Clement Biddle, at the request of the petitioner, examined the books of M'Clenachan and Moore, and informed him by letter, that on a rough estimation, he found a deficiency of 68,000 dollars due from that house, though he included in the credits given to the company many suspicious notes to a great amount. He now holds Morris's and Nicholson's notes.

Different statements were produced to the court of the supposed property of the petitioner on the 31st October 1796. By the petitioner's statement, it appeared, that after deducting the value of the real estates transferred to his children, rated at 102,400 dollars, there remained a clear balance of 26,577 dollars and 42 cents in his favor; on the other hand, the adverse statement made by his creditors, exhibited a deficiency of 97,190 dollars and 33 cents against him. The difference arose from the valuation of the real estate, and the supposed solvency or insolvency of particular debtors.

Messrs. Ingersoll, Dallas, W. Tilghman and Todd, contended for the discharge, of the petitioner ; Messrs. E. Tilghman, M. Levy, Rawle and Hallowel opposed it. The arguments of the counsel are here omitted, but their general grounds were afterwards remarked on by the court. The judges then present were prepared to deliver their opinions at the last September term but recommended an accommodation between the petitioner and his creditors. This proving abortive, the counsel of the latter now prayed the judgment of the court.

Shippen, C. J. The view and intention of the several acts of insolvency was to liberate unfortunate debtors from personal imprisonments, where they fairly deliver up their effects to their creditors, without concealment or fraud, or a strong presumption of such fraud. Concealment is the most common and ordinary species of fraud, but cannot be deemed the only species. Conveyances in trust are mentioned in the former acts of assembly, as well as the late one, as a strong indication of fraud. It was with some surprise that I heard it contended at the bar, that if there was no concealment, but the petitioner boldly dis-

closes how he had disposed of his property, however fraudulent the manner of such disposition might be, yet his person ought to be liberated, and the creditors referred for their remedy to those to whom the property had been transferred. This doctrine carried to its extent, would indeed be a monstrous mischief, and destructive of all commercial credit. If a swindler should have address enough to obtain credit for a large store of goods, and finding himself going to ruin, should, in the face of the world, ship off those goods to his friends or relations in another country, and then apply for the benefit of the insolvent acts, disclosing the whole transaction, is it possible that a court could shut its eyes to such a fraud, and discharge him from imprisonment?

The case before us is certainly not so glaring. Mr. M'Clenachan was a man of fortune, perhaps honorably acquired; but entering into speculations, and connecting himself in trade with a man of little or no fortune, found after some time his affairs considerably deranged, his bills of exchange returned upon his hands, and his notes to a large amount protested at bank. This was the time that he conceived the idea of transferring a considerable share of his property to his children. With what view was this done? He acknowledges he was alarmed at the situation of his affairs, but he tells us, he thought his estate sufficient to discharge his debts, notwithstanding these gifts to his children. In the event hovever, this does not turn out to be the case; his creditors will be considerable sufferers. His ideas at the time may possibly diminish in some sort the immorality of the act, but cannot in my mind have any such effect upon the transaction, so as to make that innocent which the law calls fraudulent. All the circumstances show he had it at heart to make a handsome provision for his children, even if it should be at the expense of his creditors. Among his other children was an infant of about ten years of age, to whom he likewise conveys a valuable property. It is very unusual for a man during his life-time, to make so young a child independent of himself in point of fortune. With what view then was this done? Obviously, that though his creditors might suffer, he was determined in all events that his children should be provided for. Whatever gloss may be put upon this business it is not sanctioned by law. Courts of equity uniformly say, that a man must be just before he is generous.

It is contended however, that he had on the 31st October 1796, when he made these transfers to his children, sufficient estate at the then value to pay all his debts. The fact itself is at best very problematical. The different statements of the contending parties make a satis-

factory judgment on the matter, difficult to be formed. But if that could be proved to be the case, should he not have immediately surrendered that property to his creditors, that the most might be made of it ? Was he justifiable in still withholding the notes of Morris and Nicholson, which were daily depreciating, at the risk of the creditors, while, what he had given to his children was subject to no such risk ? It is therefore my opinion, that the fact even if established, being thus circumstanced, would be an insufficient vindication of the petitioner.

It has been urged, that the act of assembly of 1798, under the construction of the opposite counsel, is repugnant to the constitution. I see no collision between the act and the constitution. By the latter it is directed, that the debtor shall not be confined " without a strong presumption of fraud." The act of assembly specifies two kinds of fraud, concealment, or conveying away his estate to his family or friends, the meaning whereof, although it is inaccurately worded, cannot be mistaken. It is obviously meant, that these conveyances should be to the prejudice of his creditors. If in the event it appears that such conveyances are the means of defeating the creditors, they are fraudulent ; and the person who makes the conveyances, is expressly declared not to be an object of relief under the act, as being guilty of an actual fraud.

Yeates, J. declined giving any opinion, not having heard the argument in June last.

Smith, * J. The value of the property, respecting which objections have been made to the discharge of Blair M'Clenachan, under the laws of Pennsylvania made for the relief of insolvent debtors, is great, but the amount of it, great as it is considered in the abstract, is only a secondary consideration. We almost lose sight of it when we anticipate the effects which our present decision may probably have on the morals, honor and credit of the state.

It behoves us therefore, as we regard the morals, honor and credit of the state, to give such a judgment as will secure to our fellow citizens, and all others having commerce with them, their just rights according to the laws of the land, and to guard them against subterfuges in violation of the law, on the subject matter now before us ; otherwise our decision " will be cited for a precedent, and many evils by the same example will creep into the state."

* This opinion, though prepared, was not publicly delivered.

I have so great a veneration for the law, as to suppose nothing to be law which is not founded on common sense and common honesty. 3 Term. Rep. 62, 162. 4 Term Rep. 512.

All laws rest upon the best and broadest basis, which go to enforce moral and social duties. 3 Term Rep. 63.

We have before us the case of a man, who by many years successful enterprize and industry had acquired a very handsome fortune. In the public estimation he was deemed one of the wealthiest citizens of the country. Much of that wealth had been acquired by what is called speculation. It is not therefore to be wondered at, if such a man should pursue the same measure further than less adventurous men; than men, who had not made their fortunes by adventuring would deem prudent. Nor need we be surprised if such a man be the last to be convinced, that the judgment which had so often guided him to success, had at last misled him. I entirely brush out of my mind his entering into the speculation of purchasing Morris's and Nicholson's notes for the benefit of his children, not because his testimony is not to be believed, but because such testimony ought not be received. Human beings can judge of intentions only by actions. Now what is the fact here? A man of the first credit in the city, who perhaps never before a note protested at any one of the banks, has a long string of them protested at all the banks, to the amount of 60,989 dollars 72 cents, in a short space of time. At the same time, Clement Biddle, at his request, had stated to him the great deficiency in the house of M'Clenachan and Moore. The notes of Morris and Nicholson were daily falling in value. In this embarrassed situation, a man (who had been for many years abounding in riches, yet not only had not settled any part of those riches on his children, but had not even hinted to any person that he intended to make such settlement, nor that he had entered into this speculation for their benefit; and it is indeed remarkable that he made no entry in his books of such a singular and suspicious transaction) all at once conveys to his children all his estate, which was of a certain intrinsic value, for these notes, forsooth! "Angels and ministers of grace defend us!"

He must be willfully blind indeed, who cannot see the farce acted in this transaction. His counsel certainly had great command of their countenances, to refrain from laughter, in stating it! I could as soon believe transubstantiation, as believe that he did not make these conveyances from an apprehension that the immense sum which Morris and Nicholson had issued notes for might be in danger, which determined

him to secure to himself all his estate of certain value ; I say to himself, for in such family transactions, a secret trust must be presumed. The character of Lear's daughters are not nature ; but yet no father, in full possession of reason, will put his estate in the power of his children, and render himself dependent on them, without sinister motives.

It is our duty to weigh the reasons, which have been urged against the petitioner's discharge, to compare them with those which have been offered in favor of it, and to decide according to the constitution and laws of the state.

Three reasons have been stated in favor of the discharge.

1. That on the 31st October 1796, he had property, besides that conveyed on that day, more than sufficient to pay all his debts.

That he thought he had, and if so, although in reality it was not sufficient, such conveyance ought not to subject him to imprisonment, even if it were a gift to his children.

3. If he had not enough then, nor thought he had enough, this is not the mode, for his crditors to obtain relief, and such acts will not preclude him from a discharge, under the constitution of Pennsylvania.

I will consider these reasons, but in an inverted order, beginning with the third ; which, it is contended, is supported by the 16th section of the 9th article of the constitution, which declares, that " the person of a debtor, where there is not strong presumption of fraud, shall not be continued in prison, after delivering up his estate, for the benefit of his creditors, in such manner, as shall be prescribed by law. " This necessarily implies, that if there be a strong presumption of fraud, he may be continued in prison, after delivering up his estate, as a punishment to deter others from committing fraud.

It is contended, that this fraud is confined to concealing part of his estate ; and consequently he may willfully and deliberately convey the whole, or the greater part of it in such manner, as to put it beyond the reach of his creditors, with even an avowed intention to defraud them, and may accomplish his intention completely, and yet he shall not be continued in prison for an hour, although he has defrauded them thereby of millions ; whereas if he conceals the smallest part with the same view, he is liable to imprisonment according to law.

Common sense and common honesty combine in forbidding such a construction ; it would disgrace the morality of the Jesuits, and even St. Omer's would blush at it.

The words " after delivering up his estate, " evidently show,

that the fraud contemplated, is more extensive than concealment. A doubt cannot remain, that the last act of assembly is perfectly conformable to the constitution in substance, though somewhat inaccurately worded. The title which corresponds with the enacting clauses, is, " an act providing that the person of a debtor shall not be liable to imprisonment for debt, after delivering up his estate for the benefit of his creditors, unless he has been guilty of fraud or embezzlement."

In answer to the second point, we can judge of a man's thoughts only by his actions, and if those actions contradict or are inconsistent with what he says his thoughts were, we have a sure guide in his actions, and cannot pay the least regard to alleged thoughts, which could not produce such actions from any rational man.

The single inquiry, which is material, is had Blair M'Clenachan on the 31st day of October 1796, an estate more than sufficient to pay all his debts, after he had conveyed the estates in question to his children? If this question can be clearly answered in the affirmative, it was not unlawful for him to make the conveyances.

According to the statement exhibited on his behalf, he had more than sufficient estate on that day, to pay all his debts, after those conveyances were made. According to the statement made by his creditors, it was considerably deficient. And upon the whole, it is very doubtful, even upon the principles assumed by his counsel were those principles solid, which they are not. For it is supposed, that had the large sum which he had in Morris's and Nicholson's notes, been then put into the market at once, (which was necessary as they were daily depreciating,) they would have been sold for a certain amount; but I appeal to every person who has had experience in such business, whether an instant fall would not have taken place. It is as impossible to calculate what will be the value of depreciating paper, a week or even a day hence, as to take the dimensions of a cloud, in a windy day !

A man must have an ample estate at the time he makes voluntary conveyances of a large part of it to his children ; so that if he be in debt at the time, his creditors may not thereby in the common course of dealing, have the security of their debts rendered precarious. By an ample estate, I do not mean one estimated according to the sanguine ideas of a man whose circumstances are rapidly declining, but according to the real permanent value at the time, not liable to be affected by visionary speculation.

I think it necessary to express myself in this guarded manner, because we all know that every man in declining circumstances,

be his intentions ever so upright, is irresistably led to estimate his property extravagantly high, and to shut his eyes against every deduction from the imaginary value created in his own mind.

Fraud is the judgment of law upon facts and intents. 1 Burr. 397, 474. We would be deemed by every rational, dispassionate and upright man, destitute of common sense and common honesty, of legal discernment and legal discretion, if we did not judge this transaction under all its circumstances, a strong presumption of fraud, which precludes the petitioner from the benefit of the acts of assembly, made for the relief of insolvent debtors.

Petition rejected.