### BROWN *v.* CASE.

[69 Pac. 43.]

FRAUDULENT CONVEYANCE—EVIDENCE OF SOLVENCY.

1. Evidence *held* sufficient to show that a grantor of realty was solvent at the time he executed a conveyance for a consideration possibly somewhat inadequate.

CREDITOR'S BILL—GRANTOR'S INSOLVENCY.

2. A debtor's voluntary conveyance may be set aside at the suit of creditors without proof that the debtor believed himself insolvent at the date of the conveyance, if his solvency at the time was contingent on the stability of the market in the business in which he was engaged.

INADEQUATE CONSIDERATION DOES NOT MAKE A TRANSFER VOLUNTARY.

3. Where a conveyance is made by a grantor who is indebted at the time, upon a valuable consideration that is inadequate, such inadequacy does not render the conveyance voluntary.

EVIDENCE OF ADEQUACY OF CONSIDERATION.

4. The evidence herein is fully reviewed and the conclusion reached that the grantor was solvent at the time the conveyance in question was made, and that he received a valuable consideration therefor.

RELATIONSHIP OF PARTIES—FRAUD—BURDEN OF PROOF.

5. In a creditors' suit to set aside a transfer of realty from the debtor to his sister, the relationship between grantor and grantee imposed upon her the burden of showing that she paid a valuable consideration, and took without notice of any intention to prejudice creditors.

FRAUDULENT CONVEYANCE—ADEQUACY OF CONSIDERATION.

6. Where realty worth $11,000 was by one who shortly afterward became insolvent transferred to his sister for an expressed consideration of $11,000, consisting of $7,500, which was in fact paid, and an agreement to care for the grantor during his life, the inadequacy of consideration was not so great as to shock the conscience of the court, and render the deed void as to creditors.

From Clatsop: Thomas A McBride, Judge.

This is a suit to set aside a deed of real property.  The facts are that on December 31, 1892, I. W. Case, for value, executed to Hiram Brown his promissory note for the sum of $14,392.69, payable in two years, with interest at 7 per cent per annum, and on March 28, 1893, for the expressed consideration of $11,000, conveyed to his sister, the defendant herein, lots 7, 8, and 9 in block 115, Shiveley's Astoria, the deed thereto being recorded May 29th of that year.  Case, being the owner of a bank at Astoria, was compelled to suspend business July 29, 1893, by reason of the failure of his correspondent, the Commercial National Bank of Portland; and, a suit having been commenced against him to recover an alleged special deposit, a receiver was appointed, but, that suit having been settled, Case secured an extension of time from his creditors that enabled him to open his bank December 23, 1893, and resume business, which he continued until August 1, 1894, when he executed to D. K. Warren a deed of general assignment. His said note remaining unpaid, Brown commenced an action thereon in the circuit court for Clatsop County, and caused the lots so conveyed to the defendant to be attached.  Case died testate February 3, 1895; and Duncan Stuart was appointed and duly qualified as executor of his will, and, being made a party defendant in said action, judgment was rendered in Brown's favor February 21, 1895, for $17,754.50, and said lots ordered sold.  The assignee, having converted Case's assets into money, was enabled to pay on said judgment only the sum of $9,543.58.  Brown died testate March 9, 1898, and the plaintiff, C. S. Brown, having duly qualified as executor of his will, instituted this suit July 29, 1899; but said estate having been fully settled, and the executor discharged, the court, May 25, 1899, upon a petition showing that plaintiff was a son, and Annie Wilkinson, a daughter, of Hiram Brown, deceased, and his residuary legatees, substituted them as parties plaintiff, whereupon they filed an amended complaint, alleging, in substance, the facts as hereinbefore stated, and that

Case, without any consideration therefor, and with intent to defraud his creditors, executed his said deed to the defendant.

The answer denies the material allegations of the complaint, and avers that about August 1, 1899, Case was indebted to the defendant for money had and received to her use which upon an accounting amounted to $5,000, including interest, and he, being in poor health and subject to epilepsy, which at times rendered him unable to care for himself, agreed with her that in consideration of said debt, and of her promise to live with and care for him as long as he lived, he would convey said lots to her, and that, relying thereon, she faithfully kept her part of the agreement until he died, which service was reasonably worth the sum of $2.500, and that she accepted the deed to said lots without notice of any intention on his part to hinder, delay, or defraud his creditors. For a further defense it is alleged that, at the time said deed was executed, Case was solvent, and owned and possessed property in Oregon, subject to execution, sufficient to discharge all his liabilities without resorting to the lots in question, the value of which at that time did not exceed $9,000. The reply having put in issue the allegations of new matter in the answer, the cause was referred to Charles E. Runyon, who took the testimony, from which the court found, *inter alia*, that Case was insolvent when he executed the deed to the defendant; that she gave no consideration therefor, and accepted the conveyance of the premises pursuant to a secret understanding that she would hold the title thereto for his use and benefit, and to prevent his creditors from attaching and levying executions thereon; and, having rendered a decree as prayed for in the complaint, the defendant appeals.        REVERSED.

For appellant there was a brief over the name of *J. H. & A. M. Smith,* with an oral argument by *Mr. John H. Smith.*

For respondent there was a brief over the name of *Fulton Bros.,* with an oral argument by *Mr. Charles W. Fulton.*

MR. JUSTICE MOORE, after stating the facts in the foregoing terms, delivered the opinion of the court.

It is contended by defendant's counsel that Case was solvent when he executed the deed to the defendant, and that the court erred in setting it aside. The testimony discloses that I. W. Case for about ten years prior to July 29, 1893, had been the sole proprietor of a bank in the City of Astoria, and, by the careful management of his business, had won· the confidence of his patrons, and was ranked high in financial circles. About 1889, however, the value of real property in and surrounding that city began to advance in consequence of a general belief that a railroad would soon be built thereto, thus affording better facilities for transporting to an Eastern market the lumber manufactured and the vast quantities of salmon annually canned there, and for bringing wheat, flour, wool, hops, and other inland products to the city, to be carried in ships from its wharves to foreign ports. This appreciation of land caused speculation therein, and induced Case to join others in purchasing tracts which they caused to be surveyed and platted for the purpose of selling the lots and blocks laid out thereon when their hopes of railway communication and the advantages resulting therefrom would be fully realized, thus rendering their investments profitable. Hiram Brown in 1889, being the owner of 60 acres of unimproved land, situated about a mile south of the business center of the city, and having about 3,000 feet of water front, sold and conveyed the same to I. W. Case, J. H. Gray, and two others for the sum of $60,000, each taking an equal interest therein, and the land so purchased was platted as "Case's Astoria." Gray not having paid his part of the purchase price, Case, for his accommodation, gave Brown his promissory note, as hereinbefore stated, taking Gray's note, January 2, 1893, for the sum of $12,942.64, secured by a mortgage of his interest in Case's Astoria and other property. A transcript of Case's ledger, offered in evidence, shows that his assets, March 28, 1893, were valued by him at $346,377.07, and his liabilities stated to be

$308,131.35, leaving an excess of assets of $38,245.72; but the note to Brown for $14,392.69 was not included in his liabilities, nor was any credit given for Gray's mortgage note of $12,942,64. It is quite probable, however, that the omission to enter these items was due to the belief that one would offset the other; but, however that may be, it appears from the testimony that the excess of assets should be reduced by the difference between the two notes, or to the extent of $1,450.05. A part of Case's assets, as disclosed by his ledger, consisted of certain lots and improvements thereon at Astoria, and known as the "Occident Packing Company's Cannery," and certain other lots and blocks in Case's Astoria, and one fourth of the water frontage thereto, valued as an entirety by him at $34,492,17. The testimony shows that the cannery was sold for $15,000, and, if it be assumed that the value placed thereon by Case was realized, the remaining lots and blocks must have been appraised at $19,492.17. This assumption may well be doubted, however, for in the inventory annexed to the assignment his interest in Case's Astoria is valued at $13,720.59.

The assignee, being desirous of securing for the creditors the best possible prices for the property committed to his charge, delayed the sales thereof until a railroad was constructed to Astoria from Goble, connecting with the Northern Pacific Railway from Tacoma to Portland, hoping thereby to be able to realize a sufficient sum to discharge the liabilities of the estate; but upon the sale of such interest in the lots and blocks in Case's Astoria he realized only the sum of $1,227.95, thus failing to secure the appraised value of the entire property by $18,264.22, and entailing a diminution of the "excess of assets," as disclosed by said inventory, of $12,492.64. Gray's mortgage to Case having been foreclosed, a few of the lots in Case's Astoria were sold under the decree September 5, 1895, for the sum of $485; but the assignee, not receiving such offers for the remaining real property as he considered it worth, bid it in for the estate at the sum of $10,360, and thereafter he and Gray and his wife conveyed the property so pur-

chased by him to J. E. Higgins in trust, the contract in
pursuance of which the deed was executed containing the fol-
lowing recital: ''Whereas, all parties hereto believe that, if the
said premises so purchased by the first party at such sale can
be sold at private sale from time to time in separate parcels
or otherwise, a sum sufficient to pay the entire amount of said
judgment and decree, less the amount paid thereon by the sum
bid at such sale by parties other than the first party, can be
realized.'' The property conveyed to Higgins was sold at
public auction August 30, 1897, for the sum of $2,862.75, thus
failing to secure the sum specified in the decree of foreclosure
by $9,594.89. The assignee at the same time and in the same
manner also sold the lots in Case's Astoria conveyed to him
by the assignor, and the greatest sum secured for a lot therein
either under the decree of foreclosure or from Case, was
$17.50, while the lowest was $3.50. Case owned three build-
ings at Astoria, erected on the land of others, for the use of
which he paid a monthly rent. These buildings, appraised
by him at $10,000, were sold by the assignee for the sum of
$1,800, thus reducing the ''excess of assets'' to the extent of
$8,200. The assignee, having foreclosed several mortgages
upon real property other than Gray's failed to realize from
the sale thereof the face value of the mortgage notes by
$7,488.73. He lost upon bills receivable the sum of $16,336.15;
upon stocks, $12,646.61; upon an account for coal, $616.03;
and upon bank furniture, $3,886.33; thus failing to realize
the values placed by Case on his property, as appears by his
ledger account of March 28, 1893, by the sum of $78,483.01,
so that, instead of having an ''excess of assets'' of $38,245.72,
there was a deficiency, after the forced sale of his property, of
$40,237.29.

1. It is maintained by defendant's counsel that, notwith-
standing this deficiency after such sale, Case was not insolvent
March 28, 1893, and that, if the assignee had been more ex-
peditious in disposing of the assets of the estate, he could have
realized therefrom a sufficient sum with which to pay all its
liabilities. The testimony shows that the building of a rail-

road from Astoria to Portland by way of the Nehalem Valley was commenced in 1892, and several miles of roadbed graded, but in the fall of that year the person having the contract for its construction having failed, the prosecution of the work was soon thereafter discontinued. It does not appear, however, that such suspension resulted in the immediate diminution of land values at Astoria, for the owners of real property in that city, believing that the work already done on the line of the selected route would be sufficient to induce other persons interested in railway construction to complete the proposed road, demanded the same prices for their lots and blocks in the suburbs as had been asked therefor during the excitement incident to the commencement of the work. The assignee undoubtedly entertained such an opinion, as is evidenced by the recital in the contract in pursuance of which the real property mortgaged by Gray to Case was conveyed in trust to Higgins. The testimony tends to show that the lots in Case's Astoria were worth $75 each, March 28, 1893; that the water front of that addition to the city was worth $4 a foot; and that, if Case's interest in the premises could have been sold at that time, a sum could have been realized therefor equal to his appraisement thereof. C. R. Thomson, defendant's witness, in speaking of the sum that Case could have realized if he had sold his property immediately after closing his bank, says: "He could have got three times as much, at least, if he had got out and advertised it a short time,—a week or ten days. I am satisfied he could have got at least three times as much as he did get for it." George Hill, another witness for the defendant, in speaking of the sale of this property, in connection with the assets of Case's estate, says: "Even at the time he failed, if it had been disposed of at the figures at that time, he could have paid out easy enough." The testimony also shows that the proceeds of Gray's interest in Case's Astoria and other property mortgaged to Case would more than have paid the mortgage debt, if the lots could have been sold at that time.

Frank Patton, cashier of the Astoria Savings Bank, as plaintiff's witness, referring to the receiver's report filed September 18, 1893, in answer to a question concerning Case's financial condition at the time, says: "He certainly was insolvent when this statement was made." S. S. Gordon, the cashier of the First National Bank of Astoria, in response to a similar inquiry, expresses opinion that Case's liabilities exceeded his assets at that time by $21,000. C. R. Higgins, the cashier of the Astoria National Bank, in answer to an inquiry relating to Case's financial condition in March, 1893, says: "In my judgment, the assets don't seem to be ample to cover the liabilities, as there was so little change between that time and the time of the assignment,—the way the largest amounts were listed. If I may be allowed to express my reason for that opinion, it is probably biased a little by the knowledge of the way things went afterwards, which I consider was handled as properly as it could be by anybody. It was nursed along by the assignee. The property was bid in by the assignee himself, to save it from being sacrificed, and was held as long as it could be on account of the creditors pressing for their money; and, as the thing came out, for that reason I should judge the property was listed too high." John Bryce, defendant's witness, who had been a bookkeeper in Case's bank, in answer to the question, "Do you know what his financial condition was in March, 1893, as to his being solvent?" replies, "I should say that he was perfectly solvent in '93." Duncan Stuart, who had been in Case's employ as a clerk, in reply to the inquiry, "Will you state whether or not Mr. Case was solvent on the 28th day of March, 1893?" says, "Yes, sir; I considered him so." These witnesses are corroborated by the testimony of C. R. Thomson, who says, concerning Case's financial condition, "I will state in my opinion he was solvent at that time." George Hill, a real estate agent, in answer to the question (referring to Case), "Was he generally considered to be solvent at the time of the assignment?" replies, "Yes, sir." A. L. Ross, defendant's son, who had been employed by Case in his bank, was asked the following question:

"Do you know whether he was solvent at the time he closed his doors?" to which he replies, "I think most assuredly he was." The opinion of Patton and Stoddard in respect to Case's insolvency is limited to September 18, 1893, but it will be remembered that his deed was executed March 28th of that year. Higgins, however, says there was but little change in the conditions between the time the deed was executed and when the assignment was made. This witness admits, with much candor, that his opinion may be warped by the knowledge of the subsequent disposition of the property. The witnesses who expressed a different opinion concerning Case's pecuniary condition confine their judgment to the day on which the deed was executed. After a careful consideration of the entire record, we think we are warranted in saying that the testimony of Bryce, Stuart, Thomson, Hill, and Ross, whose opinions and the reasons therefor are limited to the date of the deed in question, outweigh that of Patton, Gordon, and Higgins, whose opinions refer to a later date .

2. At the time Case executed the deed to the defendant he had in his bank vaults, in cash, the sum of $18,800.73, and city and county warrants and school bonds, immediately convertible into cash, of the value of $19,827.95; and we think the testimony clearly shows that he did not then anticipate closing the doors of his bank, which was thereafter made necessary by the failure of his correspondent, the Commercial National Bank of Portland. If Case's deed were voluntary, however, it would not be necessary, in a suit by his creditors to set it aside, that he should have believed himself insolvent at the time of the grant; it being sufficient if his solvency was contingent upon the stability of the market in the business in which he was engaged: *Carpenter* v. *Roe*, 10 N. Y. 227; *Potter* v. *McDowell*, 31 Mo. 62; *Richardson* v. *Rhodus*, 14 Rich. Law, 95; *Weeks* v. *Hill*, 88 Me. 111 (33 Atl. 778); *Kehr* v. *Smith*, 87 U. S. (20 Wall.) 31. In *Rose* v. *Dunklee*, 12 Colo. App. 403 (56 Pac. 342), Mr. Justice BISSELL, in announcing the rule for determining the financial condition of a grantor who has conveyed his property to another without receiving a valuable

consideration therefor, says: "Whenever the amount of the property so closely approximates the amount of the liabilities that the conveyance would have a direct tendency to impair the rights of creditors if they should attempt to force collection by judicial process, the debtor is adjudged insolvent. The better way to ascertain the real worth of the property is to look at the results, rather than at the evidence of witnesses concerning value. If in the end, as the result of the situation, it turns out that the debtor is insolvent and owes more than he is able to pay, this is taken as sufficient evidence of his insolvency, as to existing creditors, to permit them to attack a voluntary conveyance. The property which must remain to the debtor after such transfer must be, as some of the cases put it, clearly and amply sufficient to satisfy his debts; and it is enough in such a case to show that the grantor was embarrassed and in doubtful circumstances, and his solvency may be judged by what happens."

3. Where, however, a conveyance is made by a grantor who is indebted at the time, upon a valuable consideration that is inadequate, such inadequacy is evidence, though not conclusive, of fraud, but does not render the conveyance a voluntary one: *Washband* v. *Washband,* 27 Conn. 424; *Mathews* v. *Reinhardt,* 149 Ill. 635 (37 N. E. 85).

A careful examination of the testimony leads us to believe, as will hereinafter appear, that defendant paid a valuable consideration for the property, and secured a deed therefor without notice of any intention upon Case's part to hinder, delay, or defraud his creditors; but, inasmuch as the consideration may have been somewhat inadequate, we have deemed it proper to consider the question of Case's financial condition, and think, if the lots in Case's Astoria could have been sold in the ordinary course of business (*Bank* v. *Cook,* 95 U. S. 342), and within a reasonable time after March 28, 1893, a sum equal to his appraisement of that property could have been secured, and that he had sufficient assets, which, if converted into money in the manner indicated, would have paid all his debts.

4. This brings us to the question of consideration alleged

to have been paid for the premises. The defendant, as plaintiff's witness, testified that her father, who formerly lived at Richmond, Indiana, being dissatisfied with her choice of a husband, gave her no dowry, while he materially aided his other children when they left home; that about nine years after her marriage she moved to Iowa, and never again saw her father, though she had heard that he moved to Missouri, and had also been informed that her brother, I. W. Case, came out West, but she did not know where he settled, and had not seen him for twenty-six years, until 1881, when she met him at Des Moines, Iowa, and was then informed by him that her father died at Richmond, Indiana, in 1867, and that he had conveyed to him a farm in Missouri, with instructions to sell it, and from the proceeds thereof to pay her the sum of $2,000; that, though she was then in very moderate circumstances, she did not desire the bounty thus provided, for, if she then received the money, her husband would squander it; that, having secured a divorce and resumed her maiden name, her sons gave her $500, with which she purchased their father's interest in her home in Iowa, and after keeping boarders in that state until she had accumulated a few hundred dollars, and placed the same in a bank, she came in 1889 with her son A. L. Ross to Vancouver, Washington; that she went to Astoria in July of that year to visit her brother, where she remained about ten days, and on preparing to return to Vancouver he proposed that, if she would remain with and care for him while he lived, he, in consideration of such services, and of the money so received from her father to her use, which, with the interest, then amounted to about $5,000, would convey to her the lots in question as soon as he could secure a divorce from his wife, who had deserted him, and who held the legal title thereto, and she, after deliberating upon such offer, accepted it; that in December, 1890, her brother was divorced, and having, by exchanging other land, secured the title to the lots in question, he, at her request, conveyed the premises to her on March 28, 1893; and that she had faithfully cared for and nursed him until he died. At the time defendant appeared as plaintiff's wit-

ness, June 30, 1899, she was unable to state where the land was situated which her father conveyed to her brother; but thereafter, her son having found among Case's papers a letter from her father, the land was located in Andrew County, Missouri, and certified copies of the deed executed by her father November 1, 1866, to I. W. Case, conveying 132 acres, and reciting a consideration of $2,500, and of a deed from the latter, executed February 25, 1867, to another brother, for the expressed consideration of $2,750, conveying the same premises, and of the Tax Book of said county for 1865 and 1866, were procured and offered in evidence, showing that Nathaniel Case, defendant's father, was assessed with the land described in said deeds for those years. The defendant's son testified that in August, 1889, at Astoria, Oregon, he heard his uncle I. W. Case tell his mother that he had received to her use the sum of $2,000 from his father.

The defendant's testimony is not contradicted in any manner, except that she says she never told her sons that her brother owed her $2,000, saying: ''I never told them anything about it. I didn't know anything about him, no more than I did a perfect stranger.'' Her son testified that in 1883 he first heard that his uncle owed his mother $2,000, and in answer to the question, ''Who told you at that time?'' he answered, ''My mother. She was visiting me in Nebraska in the fall of '83, and told me of the visit of her brother in Des Moines, Iowa, in '81, when he first told her he would pay her this sum.'' The defendant was seventy-two years old when she appeared as a witness, and, while this contradiction in her testimony is not very material, we think it quite probable that, in saying she had not told her sons of the money which her brother owed her, she meant to be understood that she did not inform them thereof in 1881, when she met her brother at Des Moines, Iowa. Her testimony is consistent, reasonable, and probable. Her father, being displeased with her husband, never made any donation to her until a short time before his death, when he sought to make some reparation for his neglect, and to place her on an equality with his other children, by pro-

viding a fund for her benefit. It was not then known where she was living, and not until fourteen years thereafter did her brother learn her residence. At that time she was living with her husband, who would have squandered the money had she received it; but, having been divorced, she came to the Pacific Coast, and, in pursuance of the agreement with her brother, kept house and cared for him. We believe she testifies truthfully, and that upon an accounting with her brother there was found to be due her, in principal and interest, the sum of $5,000.

5. The relationship existing between Case and the defendant imposes upon her the burden of showing that she paid a valuable and adequate consideration for the property, and secured the conveyance thereof without knowledge or notice of any intention on his part to hinder, delay, or defraud his creditors: *Jolly* v. *Kyle,* 27 Or. 95 (39 Pac. 999) ; *Flynn* v. *Baisley,* 35 Or. 268 (57 Pac. 908, 45 L. R. A. 645, 76 Am. St. Rep. 495) ; *Mendenhall* v. *Elwert,* 36 Or. 375 (52 Pac. 22, 59 Pac. 805) ; *Wright* v. *Craig,* 40 Or. 191 (66 Pac. 807). We think she has complied with this requirement, and established the fact that she paid the sum of $5,000 on account of the purchase of the property. She cared for her brother nearly four years before she secured the deed from him, which she testified was executed at her request. She says that his malady required almost constant attention, and that her services were reasonably worth the sum of $2,500. The defendant's testimony in this respect not being contradicted in any manner, we conclude that she paid $7,500 for the property.

6. The consideration expressed in the deed is $11,000, and the defendant, in speaking of the value of the property, said, "I think it was worth about $11,000." It will be remembered that her agreement was to care for her brother while he lived, and hence a part of the consideration had not been performed when the deed was executed; but, if Case had sufficient property to pay his debts at that time, the deed would not be void: *Hapgood* v. *Fisher,* 34 Me. 407 (56 Am. Dec. 663). We believe that Case was solvent at the time he made the deed, and, the

defendant having paid a valuable consideration therefor, the inadequacy is not so great as to shock the conscience of a court of equity, or to render the deed invalid because a part of the consideration consisted in future care. The deed was not recorded for two months after it was executed, but the delay is explained by the fact that the defendant's son, to whom it was intrusted, went to the World's Fair, and forgot to have it recorded, and thereafter Case, at her request, filed it for record, two months before his bank suspended. Case lived with his sister after the deed was executed, but this ought not to defeat the conveyance; otherwise a debtor could not prefer his wife, when she is his creditor, by conveying to her his home, unless he contemplated deserting her.

Frank Patton, who was surety on Case's bond as treasurer of the Water Commission of Astoria, having seen a notice in the newspaper that Case had executed the deed in question, inquired of him what he meant by conveying away his property, and was informed that he had sold it for $11,000 cash, and put the money into his business. This statement was not made in the defendant's presence, and hence she is not bound thereby. Besides, Case may have considered that he was indebted to his sister in that sum.

Having reached the conclusion that Case was solvent at the time he executed the deed to the defendant, and that she paid a valuable consideration therefor, it follows that the decree is reversed, and the complaint dismissed.        REVERSED.