## Fidelity Trust Company, Admr., Appellant, v. Union National Bank of Pittsburgh et al., Appellants.

468

Argued October 4, 1933.    Before SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*William Watson Smith,* with him *William H. Eckert, Leon E. Hickman* and *Smith, Buchanan, Scott & Gordon,* for appellant, No. 220, appellee, No. 223.

*H. Fred Mercer,* for appellants, No. 223, appellees, No. 220.

OPINION BY MR. JUSTICE LINN, November 27, 1933:

This is a bill by the administrator pendente lite of Harrison Nesbit, deceased, to subject $755,655.02, the net proceeds of certain life insurance policies on Nesbit's life, to the claims of his creditors.   The right of plaintiff[1] to file the bill is not questioned.

---

[1] Plaintiff was appointed by the register of wills of Allegheny County on the petition of corporate creditors engaged in business in that county.   They alleged that Nesbit was indebted to them; that he died insolvent, a resident of the State of Virginia; that the receiver in Allegheny County of the Bank of Pittsburgh held the proceeds of life insurance policies on Nesbit's life which were liable

The defendants are (1) trustees who hold the proceeds pursuant to unfunded insurance trust agreements; (2) decedent's wife and three children, beneficiaries named in those agreements; and (3) Ohio National Bank of Columbus, ultimately dismissed as a party. The decree awarded to plaintiff part of the sum claimed; it has appealed to No. 220. Defendant trustees and beneficiaries, contending that plaintiff is entitled to no part of the proceeds, have appealed to No. 223. The general question is, were the policies, or certain of them, transferred in fraud of creditors: Uniform Fraudulent Conveyance Act of May 21, 1921, P. L. 1045, 39 P. S., section 351 et seq.; 13 Eliz., clause 5, Roberts's Digest 295.

Nesbit died October 21, 1931, insolvent. For many years, and up to June 23, 1931, he had been president of the Bank of Pittsburgh National Association which closed September 21, 1931, with the appointment of a receiver, three months after Nesbit ceased to be president.

On September 11, 1928, he executed an insurance trust agreement (hereafter referred to as the first agreement) describing himself as donor. The trustees named were the bank of which he was president and his son. Pursuant to its terms, he deposited with the trustees a number of policies of insurance on his own life, taken out from 1898 to 1928; the total of these policies is over $553,000. In all except two of the policies, the beneficiary named was his wife and, if he survived her, his estate. Plaintiff does not contend that the transfer of these policies in September, 1928, was fraudulent.

In all of the policies, the insured had reserved the right to change the beneficiary. When they were deposited, the change of beneficiary from his wife to the trustees was formally endorsed on each policy together with a reference to the agreement. The learned chancellor found that the donor was solvent on September 11,

for his debts; and that petitioners had filed a caveat against the probate of any will left by Nesbit.

1928.[2]  This finding is not questioned and these policies would not require further consideration in disposing of this appeal but for two contentions, one arising under the Ohio bank agreement made by the donor May 12, 1931, and the other based on plaintiff's position that the agreement is testamentary, both to be considered later.

Between March 16, 1929, and April 5, 1929, the donor obtained three additional policies in the total amount of $275,000, designating his estate as beneficiary.  The net proceeds of these policies, $255,456.15 (the face value less sums borrowed by the donor) were claimed by plaintiff; its claim was rejected, and shall now be considered. These three policies, though taken out after the first agreement was executed, were deposited with the trustees without fair consideration pursuant to a provision authorizing the subsequent deposit of additional policies. Steps to deposit two of them began October 8, 1929, and the third October 15, 1929; the changes of beneficiary were made October 11th and 26th, respectively, when the deposit may be said to have been completed.  In each case the donor exercised his power to change the beneficiary and appointed the trustees in place of his estate.

The chancellor found that the donor was solvent when he made these changes and that there was no intent to delay, hinder or defraud his creditors.  The validity of these conclusions depends on the application of the law to the facts found, and inferences to be made from them and the undisputed evidence.  We, of course, accept findings of fact that are supported by evidence, but "Where facts found are mere deductions from undisputed testimony, they are given no greater weight than findings of law": Commercial Motors Mortgage Corp. v. Waters, 280 Pa. 177, 180, 124 A. 327.  Applying that rule to the conveyance[3] of these three policies, we must differ from

---

[2] His liabilities at that time are given as $1,302,932.50; his assets, $1,883,160.

[3] "Conveyance includes every ...... transfer ...... of property ......" section 1.

the learned chancellor. Section 4 of the Uniform Fraudulent Conveyance Act, supra, provides: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without fair consideration." Section 5: "Every conveyance made without fair consideration, when the person making it is engaged, or is. about to engage, in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors, and as to other persons who become creditors during the continuance of such business or transaction, without regard to his actual intent." Section 6: "Every conveyance made and every obligation incurred without fair consideration, when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." Section 7: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors."

On the findings of fact made, and on inferences from them and from the undisputed evidence, it appears clearly that the conveyances were made "with actual intent, as distinguished from an intent presumed in law" (section 7) to hinder, delay and defraud creditors. If, however, we did not reach that conclusion, we should be obliged by the record to find that the conveyances are condemned by sections 4, 5 and 6.

Prima facie, a voluntary conveyance by one in debt is fraudulent as to creditors: Peoples Savings Bank v. Scott, 303 Pa. 294, 154 A. 489; American Trust Co. v. Kaufman, 287 Pa. 461, 469, 135 A. 210; Goodman v. Wineland, 61 Md. 449; Marmon v. Harwood, 124 Ill.

104; In re Ellitson, 174 Fed. 859; Knight v. Parkes, 12 N. J. Eq. 214. The beneficiaries had the burden of proving "that, at the time, his liabilities were not out of proportion to his assets": Peoples Savings Bank v. Scott, supra; American Trust Co. v. Kaufman, supra. That burden they have not sustained.

While it would unduly prolong this opinion to recite all the evidence (presented in the long and complicated record brought up) from which we conclude that the conveyance was made with actual intent to defraud, we shall briefly refer to the principal parts of it under four general divisions: (1) the donor's activities as president of the bank; (2) his participation in stock market manipulation; (3) his increased borrowing of money and of securities which he was unable to return; (4) the admitted fact that insolvency soon followed, assuming, for the moment, that it did not then exist.

(1) The donor had been president of the bank for more than 20 years immediately prior to his retirement in June, 1931, and owned over 2,600 shares of its capital stock. For some years before October, 1929, and while president of the bank, he had been "engaged," as the chancellor found, "in the business of and transactions in buying and selling securities for profit and continued to conduct the said business transactions until his death." Not only was much of this business highly speculative, but part of it was unlawful, and the fact must be accepted, that this experienced bank president knew that his conduct was unlawful. The chancellor made a finding, showing details, that the bank, beginning July 30, 1929, and continuing for more than a year, under the donor's direction, was engaged in buying shares of its own stock and carrying the purchases as "cash items"; this was done, in the words of the finding, "for the purpose of supporting the market for said stock." Those transactions were unlawful (12 U. S. C. A., section 83) and ground for prosecution (Morse v. U. S., 174 Fed. 539, 544 et seq.). What was his purpose in "supporting

the market for said stock"? The answer stands out clearly in the light of the fact that, in October, all his shares of the bank's stock (and indeed all his other securities except shares in a club) were pledged for his loans payable on demand. Not only was he interested in keeping up the market price of the bank shares for purposes of collateral, but the evidence discloses another reason which must have given him serious concern: he was vitally interested in preventing public discovery that his bank stock had little or no intrinsic value; and for a while he succeeded. It is not difficult to understand what would have happened to his loans, and, doubtless, to his bank, if its true condition had not been concealed. Early in October, 1929, before the conveyance of these three policies, national bank examiners made an examination and (as stated in the finding) "assets of the bank were criticized in aggregate approximate amounts as follows: Slow $5,300,000. Doubtful $702,000. Estimated losses $302,000. At the time of these examiners' report the capital stock of the bank consisted of 60,000 shares of the par value of $50 each or $3,000,000. The surplus was $3,000,000 and the undivided profits and the reserves were approximately $2,300,000." There is another finding that in May, 1928, the report of the bank examiners "showed assets then under criticism in the approximate amount of $2,800,000. This was in excess of all undivided profits and reserves which aggregated approximately $2,035,000." At this time, too, there was dissension among the bank directors.

For the purposes of his conclusion that the donor was solvent on October 8, 1929, the chancellor found the "fair salable value" of the donor's property, all, except his farm and race horses in Virginia, and his gun club shares, pledged as collateral for demand loans, and, in doing so, valued his bank stock at $135 per share, a total of $349,110. In view of the conclusion we have reached, we merely note at this point that there was error in finding the "fair salable value" instead of the "present fair

salable value" as provided in the statute. The omission to give effect to the word "present" (by allowing a period of time for marketing the shares instead of a single sale which might or might not break the market) runs through other parts of the record; the word "present" may not be disregarded: Brock's Assigned Est. (No. 3), 312 Pa. 92, 100; see, too, Castellano v. Osborne, 16 Fed. (2d) 187; Fousek v. DeForrest, 90 Mont. 448, 4 Pac. (2d) 472; Hoffman v. Nolte, 127 Mo. 120, 29 S. W. 1006. Moreover, the chancellor expressly declined to consider the *actual* value of the stock. This also was error. As the subject of inquiry was the donor's knowledge, motive and conduct in the circumstances, his knowledge of the actual value was of significant importance. The chancellor said: "Testimony as to the actual value of the Bank of Pittsburgh National Association stock was excluded and the evidence was confined to the testimony as to the public and private market and opinion evidence. In the light of future events which cannot be considered in determining this question it may be doubted whether the Bank of Pittsburgh National Association stock had any actual value during the periods under consideration, but that it had a market value we have no doubt......"

While the market value of an asset is generally controlling, this record, as a result of the donor's fraudulent concealment, necessarily presents an exception to the general rule; his state of mind, for the purpose of finding his actual intent, must be ascertained in the light of what he knew. He knew all about the real condition of his bank and its effect on the value of his shares, and on his ability to go on, and his intent must be inferred in the light of that knowledge, and not from a market value fraudulently created by him, or which he helped to create, in his own interest. Concealment,—guilty knowledge,—is evidence of actual intent. In Jarvis v. Bell, 296 Pa. 568, 574, 146 A. 153 (although evidence of market value was not available), book value of the property of corporations was rejected in favor of the actual value

of property owned by them, in determining whether a grantor was solvent at the time of a conveyance.

Another phase of the donor's bank-share-holding is relevant in considering his financial status, and his purpose in conveying the policies. He is presumed to be entirely familiar with a shareholder's liability to assessment on the bank's failure (12 U. S. C. A., section 63) ; it is a recognized liability in the law of fraudulent conveyances: Williams v. Travis, 277 Fed. 134. We, of course, do not suggest that the generally remote contingent liability to assessment takes bank stock out of the category of assets, but, in a record like that before us, it is an element that must be considered. "Debt," in section 1 of the act, is defined to include "any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." Even apart from what he must have known about the condition of his bank prior to the bank examiners' report of October, 1929, he must be treated, after his attention was called to the failing condition of the bank, as having in mind the probability of an assessment in excess of $131,000 unless the bank recovered: Cf. Crossley v. Elworthy, L. R. 12 Eq. 158. In the statement of assets and liabilities, made by the chancellor as of October, 1929, though not the "present fair salable value," the donor's Bank of Pittsburgh shares were valued at $349,110. Deducting that sum, because he knew that the stock had no intrinsic value, and increasing the statement of his liabilities by $131,000, the contingent liability to assessment (it was levied before the donor's death), the balance in his favor, even at the values put on the assets by the chancellor, is reduced to less than $80,000. In terms of section 5 of the act, that sum was "an unreasonably small capital" to continue in the speculative business on the scale in which he was engaged, even if his actual intent to delay, hinder and defraud his creditors were not obvious, as we think it is: Cf. Ex parte Russell, L. R. 19 Ch. D. 588. In their brief, defendants say that the liability to assess-

ments cannot be considered because contingent. But the statute includes contingent liabilities in the word "debt"; even under the statute of Elizabeth such liabilities were taken into account: Peoples S. & D. Bank, etc., v. Scott, 303 Pa. 294, 296, 154 A. 489; Schline v. Kine, 301 Pa. 586, 591, 152 A. 845; Brock's Assigned Est. (No. 2), 312 Pa. 18; Am. Security Co. v. Marotta, 287 U. S. 513; In re Riddler, L. R. 22 Ch. D. 74 (1883); Crossley v. Elworthy, L. R. 12 Eq. 158 (1871). Also, see section 10 of the act: Richards v. Jones (Del.), 142 A. 832; Babirecki v. Virgil, 97 N. J. Eq. 315, 127 A. 594.

(2) From September 3, 1929, to the dates of the October conveyances, the remarkable decline in stock market prices correspondingly reduced the donor's equities in his pledged stocks. Some of them were highly speculative and others salable only in restricted markets. On October 8th, his indebtedness on demand paper was over $1,460,000; by October 26th, it exceeded $1,500,000. Between September 16th and October 2, 1929, he borrowed over $270,000, of which more than $120,000 came from his own bank. As has been said, he had nothing remaining that he could pledge except his farm and horses in Virginia, and 150 shares of Woodmont Rod and Gun Club stock.[4] Calls for additional collateral were made with which he was unable to comply. As bearing on the wrongful (cf. McElroy v. Harnack, 213 Pa. 444, 63 A. 127) and speculative character of the donor's business, the chancellor notes that among the pledged assets on October 8th were 4,953 shares of Copperweld Steel stock, which the chancellor then found had a value of $272,415. One of the findings is that from June 1, 1929, to August 28, 1929, "the market......was to a considerable degree what has been called a rigged market owing to the opera-

---

[4] The horses and colts were valued by the chancellor at $82,200, but when sold at public sale by competent parties in June, 1932, brought only $6,200 gross, $3,800 net. The gun club stock could be sold only in 40 share lots to a buyer approved by the board of governors of the club.

tions of a pool which had been formed to deal in said stock of which pool [Nesbit's bank] represented by Nesbit, was a member. One purpose of the pool was to inflate the market quotations of this stock so as to induce the holders of an issue of $1,500,000 in par value of the preferred stock of the company to change their holdings for common shares. By the operations and manipulations of this pool the price of the common stock......  was inflated on the market until it reached $84 per share on or about August 28, 1929, and in this way practically all of the holders of the said issue of preferred stock were induced to exchange their shares for common stock."

On October 1st, the donor was confronted with serious disappointment in the speculative value of what appears to have been his largest investment, 1,200 shares of Weirton Steel Company stock, then pledged as collateral. For some time the merger of that company with others had been under consideration. The chancellor said: "There is also testimony that Nesbit was a bull on the Weirton Steel stock in September, 1929, holding it for $1,000 per share when it was selling for $500 to $600 per share." The terms of the merger were disappointing to the donor. The chancellor found that on October 8, 1929, the "fair salable value" of the stock was $375 per share.

(3) The donor realized the impossibility, in October, of converting his property and the equities in his pledged assets, into cash at prices that would enable him to pay his demand obligations, but he gained time by making new loans to pay old ones, in the vain though common hope of a change in the market (Ex parte M'Clenachan, 2 Yeates 502, 508; Shapiro v. Wilgus, 287 U. S. 348, 354), and the record shows the hopeless struggle to keep afloat. Less than three weeks after conveying the third policy, he borrowed 1,000 shares of Copperweld Steel Company stock, had them transferred to his own name and assigned them to a bank as collateral for a loan. He was never able to return that stock. On January 8, 1930, he borrowed 2,000 more shares of the stock,

pledged it for his debts, and was never able to return it. In July, 1930, he borrowed 1,000 shares of Pittsburgh Screw, etc., Company stock, and, in October, 1930, 400 shares of Columbia Gas & Electric Company stock; both blocks of stock were pledged for loans and were never returned. In the case of each of those borrowings, the chancellor finds that the donor was "pressed for additional collateral." In April, both in 1930 and in 1931, he borrowed from the insurers on the three insurance policies issued in 1929 (taken down from the trust agreement under his reserved powers) more than $21,000, all that the insurance companies would lend; and it is to be noted that these were advances on the proceeds ultimately payable, and that he could not be required to repay them. On other insurance policies, between March, 1930, and July, 1931, he likewise obtained over $56,000. Though all these transactions followed the conveyances, the short interval, large amounts, continuous transactions and the constant decline indicate a disturbing unsoundness of condition in October of which he must have been conscious. On November 12, 1930, he borrowed $200,000 from his bank on a demand note signed by his wife but guaranteed by him. When she was sued on the note, she successfully defended on the ground that she signed for her husband's accommodation. It may be noted at this point, as reflecting the donor's condition during the period from October onward, that the chancellor finds that on June 5, 1930, the donor's assets, at valuations made by the chancellor, exceeded his liabilities by only $45,904 and that on that date "the property in the hands of Nesbit was an unreasonably small capital for the conduct of his business of, and transactions in, buying and selling securities for profit......" But, when the amount at which the Bank of Pittsburgh stock was taken for the purposes of that balance sheet, $262,-400, is deducted, as it should be, and the liabilities are also increased by the shareholder's assessment, it will be seen how hopelessly insolvent the donor then was; the

subject is now referred to, merely to show the chancellor's view of the change of the donor's condition between October, 1929, and the following June.

(4) The chancellor records the gradual diminution of the donor's assets and the increase of his liabilities during the period beginning in September, 1929, and finds that, on April 22, 1931, he was insolvent and remained so until his death. This condition and the borrowing referred to above, though subsequent to October 26th, is relevant in determining the donor's condition at the time of the conveyances and his intention in then changing the beneficiary of his insurance:[5] Trust Co. v. Sedgwick, 97 U. S. 304, 307; Hood v. Jones, 5 Del. Ch. 77. In Crossley v. Elworthy, L. R. 12 Eq. 158, insolvency followed nine months after the challenged conveyance; MALINS, V. C., referred to the speculative character of the insolvent's business, considered as one of the circumstances in the general problem, a contingent tort liability reduced to judgment after the date of the conveyance.

In considering solvency in October, 1929, the court below was influenced by the donor's credit, saying that "he maintained his credit until he died." But, as has been shown, what he did to this end was done by concealment and false pretenses, made with knowledge that they were false. Such false pretenses support the inference of actual intent. In dealing with this element of credit, it must be remembered "that the test of a trader's insolvency[6] is ability to pay his debts in the ordinary course, not inability to raise the money for them in the ordinary course": Peabody v. Knapp, 153 Mass. 242; see, too, Baily v. Hornthal, 154 N. Y. 648; Alpha Hardware, etc.,

[5] See section 6 of the act declaring fraudulent conveyances by one intending to incur debts.

[6] Section 2 of the act provides: "A person is insolvent when the present, fair, salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."

v. Ruby Mines Co., 97 Cal. App. 508, 275 Pac. 984; Lee
v. Kilburn, 3 Gray 594; Ex parte Russell, L. R. 19 Ch. D.
588.

The appellee beneficiaries contend that the donor with-
drew nothing from his creditors to pay premiums, and
that, as creditors had no claims to the loan or cash sur-
render values of the policies at the time of the convey-
ances, nothing was taken from them by changing the
designation of beneficiary. This argument disregards
the true nature of the transaction. Each policy was a
chose in action, an obligation to pay the insured's legal
representatives on his death, if he complied with the con-
ditions of the policy. That obligation was of value to
the insured's creditors; he was able to borrow on the
policies, and the proceeds, when received by his execu-
tors, would help pay his debts: McKown's Est., 198 Pa.
96, 47 A. 1111; Huff's Est., 299 Pa. 200, 205, 149 A. 179;
Burnet v. Wells, 289 U. S. 670, 679. By conveying that
asset in fraud of creditors' rights, a constructive trust
resulted for their benefit; on familiar principles, applied
in tracing trust property, they may follow the asset in
whatever form it takes, which, in this case, is the fund
in the custody of the trustees.

In October, 1929, the donor could not, with reason,
have considered that he had not provided adequate insur-
ance for his wife and children, because they were then,
under the trust agreement, the beneficiaries of insurance
greatly in excess of $500,000 and his own affairs were in
very precarious condition. In addition, his wife was the
beneficiary of a $25,000 policy, not deposited under the
trust agreement.

From the circumstances referred to, we think only one
inference is permissible, and that is, that the donor ac-
tually intended to deprive his creditors of their expect-
ancies in the policies. No other inference will explain
or reasonably account for the gift. The reservation of
the right to deal with the policies as his own is some evi-

dence of the actual intent to hinder, delay and defraud his creditors. If he intended only to benefit his family, it was unnecessary to reserve power to revoke and to appoint to others: Cf. Mitchell v. Stiles, 13 Pa. 305, 309.

Considered in another aspect, the transaction is condemned by section 5, under which neither intent nor insolvency at the time is of moment. If the donor were considered solvent in October, 1929, his surplus must have been too small for the conduct of his speculative business. With his property pledged, as has been stated, the possibility of continuing operations depended on the manipulation of equities in a wildly fluctuating stock market. The precarious chance of successful issue of business conducted with such slender margin must be considered and would warrant finding that conduct was fraudulent: Carpenter v. Roe, 10 N. Y. 227; Brown v. Case, 41 Ore. 221, 69 Pac. 43. The event demonstrated that his capital was inadequate, and while others also failed to forecast the rapidity of the deflation in stock market prices in October, 1929, and following months, the test, under section 5, is not intent, but reasonable sufficiency of assets for what is undertaken. Our conclusion on this branch of the case, therefore, must be that plaintiff is entitled to the net proceeds of these three policies.

We come now to the questions arising out of the beneficial interest conveyed to the Ohio National Bank of Columbus as additional collateral for a demand loan of $200,000. In the first trust agreement, the donor reserved power to modify or revoke it in whole or in part. In an agreement of June 5, 1930, between the donor and his trustees (hereafter called the second agreement), the parties, following a recital of the delivery of the first agreement and the deposit of the insurance, enlarged and elaborated the terms of the first agreement and also subjected all the deposited policies to the terms of the second agreement, perhaps intended as a substitute for the first agreement. The donor again reserved extensive

powers over the trust property, as appears by a provision quoted in the margin.[7]

Pursuant to that reservation, on May 12, 1931, the donor and his trustees executed an amendment (hereafter called the Ohio bank agreement) of the second agreement and delivered it to the Ohio National Bank of Columbus. Part of this agreement is quoted in the margin.[8]

---

[7] "ARTICLE FOURTH. Until the death of the Donor, he reserves to himself at all times the following rights: to sell, assign or hypothecate any policy of insurance included under the provisions hereof; to exercise any option or privilege granted by any of said policies; to borrow any sum in accordance with the provisions of any of said policies; to receive all payments, dividends, surrender values, benefits, or privileges of any kind which may accrue on account of any of said policies; to cause additional policies of insurance, securities or other property to be brought within the operation of this trust, or to withdraw from its operation any or all of the policies, securities or other property at any time subject to the terms hereof; and by an instrument in writing delivered to the Trustees to modify, alter or revoke this agreement in whole or in part, provided, however, that the duties, powers and liability of the Trustees hereunder shall not be substantially changed without their written consent."

[8] "WHEREAS the Donor is indebted to the Ohio National Bank of Columbus, Ohio, in the amount of Two Hundred Thousand Dollars ($200,000.00), evidenced by his collateral note dated May 22nd, 1930.

"Now this agreement witnesseth:—

"First. That so long as the Donor is indebted to the Ohio National Bank of Columbus, Ohio, its successors or assigns, in any amount, the aforesaid Agreement dated June 5th, 1930, shall not be revoked or amended without the consent in writing of the said Ohio National Bank of Columbus, Ohio.

"Second. In case of the death of the Donor, the Trustees shall within fifteen days purchase the aforesaid note of the Donor or any renewals or extensions thereof from the Ohio National Bank, of Columbus, Ohio, its successors or assigns, for the amount then due on said note, or any renewal or extension thereof, including interest thereon to the date of purchase, upon the assignment of said note

The donor was insolvent when the Ohio bank agreement was executed. It was delivered in response to a request from the bank for additional collateral. The chancellor stated that the Ohio bank must be "held to a knowledge that the transaction which it proposed to the trustees was fraudulent." Within 15 days of the donor's death the Ohio bank offered (second paragraph of agreement) the note and accompanying collateral to the trustees for payment in accordance with its terms. It was not paid.[9]

The learned chancellor also held that the Ohio bank agreement was "an assignment of property in trust by a debtor to trustees on account of the debtor's inability at the time of the assignment to pay his debts, to prefer one creditor over others, which must be held and construed to inure to the benefit of all the creditors of Harrison Nesbit in proportion to their respective demands, under section 1 of the Act of April 17, 1843, P. L. 273......," and awarded to plaintiff that sum with interest, less the stipulated value of the collateral sold by the bank, making an award of $57,494.20. On its appeal, plaintiff contends that the entire amount with interest should have been awarded. The defendants, in their appeal, assert

to the Trustees and the delivery to them of the collateral securing said loan.

"Third. This amendment to the Agreement dated June 5th, 1930, shall be in full force and effect until and unless the Ohio National Bank of Columbus, Ohio, shall certify to the Trustees that the debt of the Donor to it is fully paid and satisfied."

[9] After the decree nisi, the Ohio bank, then still a party defendant, filed a petition for an order of discontinuance as to it, setting forth that it had then "sold a part of said collateral securities and is about to sell the remainder thereof, in consequence of which it no longer has any interest other than such claim as the creditors of Harrison Nesbit generally may be found to have in funds now held by the trustees of Harrison Nesbit, now deceased, under the life insurance trusts 'A' and 'B' [first and second agreements] and is now desirous of discontinuing the said suit insofar as your petitioner has sought and prayed for affirmative relief." The petition was granted.

that plaintiff is not entitled to any part of this amount: that (a) the Act of 1843 was repealed by the Insolvency Act of 1901, P. L. 404, 423; (b) the Ohio bank agreement was not accepted by the bank; and (c) that insurance payable to a wife and children is exempt by statute from the claims of creditors. We shall consider these in the order mentioned.

(a) As the Bankrupt Act of 1898 was in force when the Act of 1901 was passed, such parts of the local law as dealt with matters comprehended within the Bankrupt Act never became operative. It dealt with the general subject of insolvency and, specifically, with various elements of that subject, some within the scope of the Bankrupt Act, and some without. The title gives notice of this. It is "An act relating to insolvency; embracing, among other matters, voluntary assignments for the benefit of creditors, and adverse proceedings in insolvency by creditors; forbidding, also, certain preferences; providing for the distribution of the insolvent's estate, and in certain contingencies relieving him, and others liable with him, from further liability for his or their debts." The right, solvent or insolvent, to make a voluntary assignment for creditors is not dependent on statute, but is an incident of ownership. Assignment for the benefit of others creates a trust which would be administered on equitable principles in the absence of statute. Legislative provision for the administration of such assignment is therefore not necessarily an encroachment on the federal field; whether it is or not depends on the text of the statutes; that is also true of the administration of preferences. Provisions for the discharge of an insolvent from liability for his debts are in a different category (Hanover Nat. Bank v. Moyses, 186 U. S. 181, 185 et seq.) and are within the scope of the bankruptcy legislation. The legislature was, of course, cognizant of the paramount federal power. There is no obstacle to the separation of one class of provisions in the act from the other.

The provisions of the Act of 1901 regulating the administration of voluntary assignments for creditors are separable from its bankruptcy provisions. Provisions for discharge, for example, are necessarily inoperative so long as the Bankruptcy Law is in existence: Boese v. King, 108 U. S. 379, 384, 387; Stellwagen v. Clum, 245 U. S. 605, 615; International Shoe Co. v. Pinkus, 278 U. S. 261, 266; Pobreslo v. Boyd Co., 287 U. S. 518, 525; Johnson v. Star, 287 U. S. 527. The state law is not suspended by the fact that a voluntary assignment for creditors may be an act of bankruptcy, and, in some circumstances, set the Bankrupt Act in motion: Randolph v. Scruggs, 190 U. S. 533, 537; the subject is fully treated in Pobreslo v. Boyd Co. and Johnson v. Star, supra. We are of opinion that the provisions for the administration of voluntary assignments for creditors are, and have been, effective ever since the passage of the act, and that only the provisions covering matters comprehended within the Bankrupt Law have been and are suspended.

The Act of 1843, expressly repealed (1901, P. L. 423), was entitled "To prevent preferences in assignments." It dealt with voluntary assignments, for the administration of which provision is made in the repealing statute. A comparison of the voluntary assignment provisions of the Act of 1901 with prior acts, repealed by section 42, shows that provisions of the Act of 1901 were intended to be in substitution and revision of the earlier acts specifically repealed, and indicates legislative intention that the repeal of legislation, not within the purview of the Bankrupt Act, should become effective at once. The Act of 1843 was not a bankrupt act; the repeal is therefore effective. Section 3 of the Act of 1901 provides that a preferential assignment shall act as an assignment of all the debtor's estate; such an assignment is also contrary to the Uniform Fraudulent Conveyance Act.

(b) There is a presumption that the bank accepted the agreement. "The assent of the creditor is presumed to be given to a trust created for his benefit and after such

assent the trust is irrevocable by the grantor": Bispham, Equity, 9th edition, section 68, and cases cited in note 3 (on page 130), among them McKinney v. Rhoads, 5 Watts 343; Read v. Robinson, 6 W. & S. 329. But, in addition, there is evidence that in September, 1931, the Ohio bank exercised its veto power (see first paragraph of agreement), when the donor desired to take down various policies for the purpose of borrowing on them; and, as has been cited, within 15 days after his death the bank called on the trustees for performance.

(c) We must also reject the contention that the Ohio bank transaction is within the statutory exemption saving family insurance from creditors (e. g., Act of June 28, 1923, P. L. 884). The right of the wife and children to participate in the insurance was an expectancy measured by the policies and the insurance trust agreements. One of the conditions of the donor's gift was that, by the exercise of power expressly reserved, he might destroy altogether the expectancy of his wife and children. By the Ohio bank agreement, he diminished the contingent beneficial interest theretofore conferred on his family, and subordinated that interest in the insurance proceeds to the extent of the loan and interest.

The situation, presented by the Ohio bank agreement, was this: in the collateral, the donor had an equity, the value of which depended on whether he paid the note, or, if the collateral was foreclosed, whether it realized more than the debt. As the bank held the collateral at the time of the donor's death, that equity then passed to his personal representatives. The collateral was afterward sold by the bank for less than the debt, the equity had no value to the estate and ceased to be an element in the problem with which we are now dealing. While the statute exempts insurance payable to the family, it does not exempt proceeds payable to a creditor or creditors and the family; the creditor's interest is not exempt. The Ohio bank agreement was a conveyance, to the bank, of an interest in the proceeds expected to come into the

hands of the trustees; the value of the right was the face of the note with interest. Though it turned out that the bank did not realize on the conveyance, the failure to obtain the value which the donor had carved out of what was once an expectancy provided for his family alone, did not revest that interest in the family. It remained where it was, an asset of the donor, which on his death passed to his personal representatives in such amount as the bank might have claimed. The plaintiff is therefore entitled to that interest in the proceeds. There was error in awarding to the plaintiff merely the difference between the note, with interest, and the stipulated value of the collateral; for the reasons stated, the entire amount must be awarded to the plaintiff. This amount is $200,000 with interest from the date to which it has been paid, to October 21, 1931, the date of the donor's death, but no longer, as the estate is insolvent.

The next situation to be considered grows out of action by the donor in April, and in July, 1931, when he was insolvent. Exercising the reserved power to modify or revoke the insurance trust agreement, on April 22, 1931, he requested a change of beneficiary of a certain policy in the sum of $10,000 from the trustees to his estate. The change was made and endorsed on the policy April 25, 1931. Thereafter, perhaps on the same date, the beneficiary was again changed from his estate to the trustees. On or about July 24, 1931, he requested another insurer to change the beneficiary in a policy in the sum of $25,000 from the trustees to his estate; the change was made and endorsed on the policy on or about that date. Subsequently on July 30, 1931, he caused the beneficiary under this policy to be changed from his estate to the trustees. It is said that these changes were made to enable him to borrow money, though there is evidence that he could have done that without making the changes. The reason or motive for the change does not appear; we can deal only with the fact that it was made. After his death, the trustees received $4,132.37 as the net proceeds of the first

policy, and $19,189.41 as the net proceeds of the second policy, in each case, the face of the policy, less loans or advances to the donor. The question now is whether the proceeds of these policies, which, for the short period indicated, had been payable to his estate, and which, while insolvent, he appointed to the trustees, should go to the plaintiff for creditors, or whether, having once become an expectancy, liable for debts, the rights of creditors may be defeated by the conveyance to the trustees. The learned court below said, "The estate of Harrison Nesbit was not decreased by these changes of beneficiary." It is certain, if the donor had not made the last change of beneficiary, that the proceeds would have gone to plaintiff as the personal representative of the decedent. There was no consideration for diverting the course of the proceeds from his estate. Once an expectancy in the estate, they remain so for all purposes (subject only to the conditions of the policies), unless properly conveyed for fair consideration. As the donor was insolvent, the conveyance is within the statute (McKown's Est., supra; Huff's Est., supra) and the trustees are not entitled to receive the proceeds.

Finally, plaintiff claims the entire proceeds on the ground that the insurance trusts were testamentary because of the large powers reserved to the donor and an alleged desire to have the proceeds applied for the benefit of his general estate. It is said that the agreements "vested no present interest in anyone but Harrison Nesbit and only appointed [pointed out] what was to be done after his death." But as the beneficiary-trustee had an expectancy in the insurance proceeds which would become the res of the trust, this objection must be rejected: Johnson v. Scott, 76 N. Y. Misc. 641, 137 N. Y. Supp. 243; cf. Beirne v. Continental-Equitable Trust Co., 307 Pa. 570, 576, 161 A. 721. When the donor executed the agreements, he also executed wills, said to contain trust provisions, for his estate, similar in character to those declared in the agreement for the insurance, and ap-

pointed the same parties as executors and trustees. The insurance trustees were empowered to "purchase stocks, bonds or other property, real or personal, from the executors or other representatives of the donor's estate, or ......make such loans to them, which loans may be secured or unsecured" without personal liability for loss. Even if this indicated, as appellant contends, an effort to facilitate, or otherwise benefit, the administration of his estate, it does not make the agreement testamentary, or deprive the proceeds of their exempt character: Cf. Blumberg v. Coxe, 8 Fed. (2d) 735. The record shows that the donor did not intend to deprive his family of the benefit of the insurance except as to the interest granted to the Ohio bank; leave to invest in nonlegal securities is consistent with the donor's wish to aid his family and not to unite the proceeds with his estate. In determining whether an instrument is testamentary, intention is important (Beirne v. Continental-Equitable Trust Co., 307 Pa. 570, 161 A. 721; Kimmel's Est., 278 Pa. 435, 123 A. 405; Davis's Est., 275 Pa. 126, 118 A. 645; Windolph v. Girard Trust Co., 245 Pa. 349, 360, 91 A. 634; Hurley's Est., 16 D. & C. 521, 523) ; here the evidence is conclusive that he sought to keep as much of the proceeds as possible within the statutory exemption from creditors and separate from his estate which was not exempt.

## ORDER

In No. 220, the record is remitted with instructions to modify the decree as follows:

To award to the plaintiffs the net proceeds

(1) Of policy No. 892762, dated April 5, 1929, issued by Massachusetts Mutual Life Insurance Company in the sum of $100,000.

(2) Of policy No. 1391182, dated April 4, 1929, issued by the Mutual Benefit Life Insurance Company in the sum of $125,000.

(3) Of policy No. 2155522, dated March 16, 1929, issued by the Northwestern Mutual Life Insurance Com-

pany in the sum of $50,000; the total of the net proceeds of said three policies appearing to be $255,456.15.

Also to award to the plaintiffs

(4) The amount of $200,000, the subject of the agreement dated May 12, 1931, amending the insurance trust agreement of June 5, 1930, with interest on that amount unpaid to the date of the death of Harrison Nesbit;

(5) The net proceeds of policy No. 112325, dated December 31, 1909, issued by State Mutual Life Insurance Company in the sum of $10,000, the net proceeds appearing to be $4,132.37;

(6) Also the net proceeds of policy No. 2117188, dated December 14, 1915, issued by the Equitable Life Assurance Society of the United States in the sum of $25,000, the net proceeds appearing to be $19,189.41; and

(7) To award to defendant trustees the balance of the proceeds in suit in their hands.

The costs of this proceeding shall be paid out of the fund for distribution.

No. 223 is a joint appeal, not authorized by statute and must therefore be dismissed. We have however considered the merits in disposing of No. 220. Costs to be paid as in No. 220.