James MOODY, Trustee of the Estate of Jeannette Corporation and the Committee of Unsecured Creditors of Jeannette Corporation

v.

SECURITY PACIFIC BUSINESS CREDIT, INC., the Coca–Cola Bottling Company of New York, Inc., KNY Development Corp., J. Corp., John P. Brogan, John J. Brogan, Hanley Dawson, III, James A. McLean, James R. Winoker, Robert M. Janowiak, Alan MacLachlan, Interdyne, Inc., Muench–Kreuzer Candle Company

v.

Frank W. STOREY, Calvin MacCraken, Individuals,

James Moody, Trustee of the Estate of Jeannette Corporation, Appellant.

No. 91–3544.

United States Court of Appeals, Third Circuit.

Argued Feb. 25, 1992.

Decided Aug. 7, 1992.

Robert J. Cindrich (argued), David B. Mulvihill, Cindrich & Titus, Douglas A. Campbell, Campbell & Levine, Pittsburgh, Pa., for appellant.

William F. Lloyd (argued), Michael J. Sweeney, Sidley & Austin, Chicago, Ill., James D. Morton, Buchanan Ingersoll Professional Corp., Pittsburgh, Pa., for appellee Security Pacific Business Credit, Inc.

George E. McGrann (argued), David J. Armstrong, Dickie, McCamey & Chilcote, Pittsburgh, Pa., Philip M. Halpern, Collier, Cohen, Shields & Bock, New York City, for appellees The Coca-Cola Bottling Co. of New York, Inc. and KNY Development Corp.

Robert B. Sommer (argued), H. Woodruff Turner, Terry Budd, Kirkpatrick & Lockhart, Pittsburgh, Pa., for appellees J. Corp., John P. Brogan, John J. Brogan, Hanley Dawson, III, James A. McLean, James R. Winoker, and Muench-Kreuzer Candle Co.

Before: SLOVITER, Chief Judge, and SCIRICA and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This bankruptcy case requires us to address, once again, the application of the fraudulent conveyance laws to a failed leveraged buyout. In *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1297 (3d Cir.1986), *cert. denied sub nom. McClellan Realty Corp. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987), we established that the Pennsylvania Uniform Fraudulent Conveyance Act (UFCA) extends to leveraged buyouts. This case raises several questions about

the application of this Act to the failed leveraged buyout of Jeannette Corporation.

On July 31, 1981, a group of investors acquired Jeannette in a leveraged buyout. Less than a year and a half later, Jeannette, which had been profitable for many years, was forced into bankruptcy. The bankruptcy trustee brought this action to set aside the advances made and obligations incurred in connection with the acquisition. The trustee alleges that the leveraged buyout constitutes a fraudulent conveyance under the UFCA and is voidable under the Bankruptcy Code. After a bench trial, the district court entered judgment for defendants. *Moody v. Security Pac. Business Credit, Inc.*, 127 B.R. 958 (W.D.Pa.1991). We will affirm.

## I

### A

Founded in 1898, Jeannette Corporation manufactured and sold glass, ceramic, china, plastic, and candle houseware products in the United States and Canada.[1] For many years, Jeannette was a profitable enterprise. From 1965 to 1978, its annual net sales grew on a consolidated basis from $9.6 million to $61.7 million and its annual gross profit margin ranged from 18% to 32.9%. In each of those years, Jeannette earned a net profit. From 1975 to 1977, Jeannette's sales increased annually by 16%. Its consolidated pre-tax profit was $3.4 million in 1977 and $6.1 million in 1978.

In 1978, the Coca–Cola Bottling Company of New York, Inc. acquired Jeannette for $39.6 million. Shortly thereafter, Coca–Cola increased the total net book value of Jeannette's property, plant, and equipment (PP & E) by $5.7 million after a manufac-

turer's appraisal valued these assets at $29 million. From 1978 to 1981, Coca–Cola invested $6 million in Jeannette for capital expenditures, and $5 million for maintenance and repair of its physical plant.

At first, Jeannette was not as profitable under Coca–Cola's ownership. It suffered a consolidated $5 million pre-tax loss in 1979, in part because of the adoption of new valuation procedures for inventory, and net sales fell by $4 million. However, Jeannette's performance rebounded in 1980. Net sales increased by $9 million and the company's gross profit margin doubled. Although 1980 was a break-even year before recognition of acquisition costs, Jeannette reported a $1.3 million pre-tax profit and had a $3 million positive cash flow.

Jeannette projected that this trend would continue into 1981. Although Jeannette had an operating loss of $1.1 million in the first half of 1981, because its business cycle produced stronger cash flows in the latter half of the year, the company projected a pre-tax profit of $500,000 before interest expenses.

### B

In late 1979, Coca–Cola decided to sell Jeannette and focus attention on its core bottling business. In June 1981, John P. Brogan expressed an interest in acquiring Jeannette. Brogan was affiliated with a small group of investors in the business of acquiring companies through leveraged buyouts, the hallmark feature of which is the exchange of equity for debt.[2] On July 22, 1981, Coca–Cola agreed to sell Jeannette for $12.1 million on condition that Brogan complete the transaction by the end of the month.

---

1. In 1981 Jeannette comprised four principal entities: the Jeannette Glass division, Brookpark division, Royal China subsidiary, and Old Harbor Candle subsidiary.

2. As this court recently explained:

 A leveraged buyout refers to the acquisition of a company ("target corporation") in which a substantial portion of the purchase price paid for the stock of the target corporation is borrowed and where the loan is secured by the target corporation's assets. Commonly, the acquirer invests little or no equity. Thus, a

 fundamental feature of leveraged buyouts is that equity is exchanged for debt.

 *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 645 (3d Cir.1991), *cert. denied sub nom. Committee of Unsecured Creditors v. Mellon Bank, N.A.*, —— U.S. ——, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992). *See generally* Cieri *et al., An Introduction to Legal and Practical Considerations in the Restructuring of Troubled Leveraged Buyouts*, 45 Bus.Lawyer 333, 333–49 (1989) (discussing the characteristics of leveraged buyout transactions).

Brogan contacted Security Pacific Business Credit Inc., a lending group that had financed one of his prior acquisitions, about obtaining financing. He submitted one year of monthly projections, based in large part on Jeannette's 80-page business plan for 1981, which showed that Jeannette would have sufficient working capital under the proposed financing arrangement in the year following the acquisition. Before agreeing to finance the transaction, however, Security Pacific undertook its own investigation of Jeannette.

Security Pacific assigned this task to credit analyst Stephen Ngan. Based on his discussions with Jeannette personnel and a review of the company's financial records, Ngan made his own set of projections. He concluded that Jeannette would earn a pretax profit of $800,000 after interest expenses in its first year of operation, and recommended that Security Pacific finance the acquisition. He thought Jeannette was a "well-established" company with "a good track record for growth and earnings."

After reviewing Ngan's recommendation, together with an inventory report, the 1978 appraisal of Jeannette's PP & E, Brogan's projections, and a 55-page report on Jeannette prepared by another bank, Security Pacific decided to finance the acquisition. At that point, Coca-Cola formally approved the sale of Jeannette to J. Corp., which had been incorporated for the purpose of acquiring Jeannette.

### C

The acquisition of Jeannette was consummated on July 31, 1981. J. Corp. purchased Jeannette with funds from a $15.5 million line of credit Security Pacific extended Jeannette secured by first lien security interests on all Jeannette's assets. J. Corp. never repaid Jeannette any portion of, or executed a promissory note for, the amount ($11.7 million) Security Pacific initially forwarded to J. Corp. on behalf of Jeannette to finance the acquisition. Other than new management, the only benefit Jeannette received was access to credit from Security Pacific.[3]

As with most leveraged buyouts, the acquisition left Jeannette's assets fully encumbered by the security interests held by Security Pacific. Jeannette could not dispose of its assets, except in the ordinary course of business, without the consent of Security Pacific, and was prohibited from granting security interests to anyone else. As a result, Jeannette's sole source of working capital after the transaction was its line of credit with Security Pacific.

Although Jeannette's total outstanding balance never exceeded the amount of the initial advance ($11.7 million), the total credit advanced Jeannette was many times this amount because of the "revolving" nature of its line of credit with Security Pacific. Jeannette's accounts receivable were forwarded to Security Pacific by way of the Mellon Bank, and were credited against its outstanding loan balance. As this balance was paid down, more credit was made available, which Jeannette drew on to finance operations and generate sales.

Although the initial advance was payable on demand, Jeannette carried this obli-

---

**3.** The transaction comprised the following steps, which were deemed by the parties to have taken place at once: (1) J. Corp. entered into an agreement with Coca-Cola and KNY Development Corporation, a wholly owned subsidiary of Coca-Cola, to purchase all outstanding stock of Jeannette; (2) J. Corp. obtained a $12.1 million unsecured loan from Security Pacific and executed a demand note therefor; (3) these funds were transferred from Security Pacific to Coca-Cola to fund the purchase of Jeannette stock, which was transferred from KNY Development to J. Corp.; (4) upon acquisition of the stock, J. Corp. appointed a new board of directors for Jeannette and named Brogan chairman;

(5) Jeannette entered into a $15.5 million revolving credit arrangement with Security Pacific, in exchange for which it granted Security Pacific first lien security interests in all its assets; (5) on behalf of Jeannette, Brogan directed Security Pacific to remit $11.7 million from the revolving credit facility to J. Corp., which was used to repay all but $400,000 of the demand note to Security Pacific; and (6) Jeannette and Security Pacific entered into a "lock box" agreement, whereby Jeannette's accounts receivable would be forwarded to the Mellon Bank and credited against the outstanding balance on Jeannette's line of credit.

gation as long-term debt. This reflected the parties' understanding that the transaction would give rise to a long-term lending relationship in which the balance on the revolving credit facility would be paid down over several years. Security Pacific obtained no up-front fees and stood to profit by earning interest on the line of credit at $3\frac{1}{4}\%$ above prime (at that time about 20%).

## D

Jeannette operated as a going concern from the latter half of 1981 into 1982. From August through December 1981, its net sales exceeded $31 million and the company realized a $6 million gross profit. During the same period, Jeannette had a positive cash flow of $3 million. Part of Jeannette's success during this period is attributable to its business cycle, which produced stronger cash flows in the latter half of the year.

By the end of 1981, Jeannette had received over $43 million in credit advances from Security Pacific, and had $4 million of available credit. A year after the leveraged buyout Jeannette had received $77 million in advances, and had $2.3 million in available credit. Jeannette never exhausted its credit and Security Pacific never refused a request for funds, although on several occasions it suggested that Jeannette withdraw smaller amounts.

Although Jeannette's performance initially tracked expectations, its financial condition deteriorated steadily in 1982. Jeannette experienced a shrinking domestic glassware market, a marked increase in foreign competition, dramatic price slashing and inventory dumping by its domestic competitors, and a continued nationwide recession. In January 1982, orders for Jeannette products fell to 86% of projected levels and in February orders fell to 70%. This decline in sales constricted cash flow and contributed to an inventory build-up.

Jeannette responded by reducing production and lengthening its accounts payable schedule. From late 1981 to early 1982, the company extended its payment period from 30 days to 45 days and then to 60 days. In late February (or early March) 1982, it invoked an 88–day period. However, it remained unable to pay its creditors in a timely fashion. In March 1982, Jeannette was forced to shut down one of the three glass tanks at its Jeannette Glass division, and, in late July, it shut down another. Shortly thereafter, Jeannette sold the inventory and fixed assets of its Old Harbor subsidiary for $2 million. In August 1982, the last tank was shut down at the Jeannette Glass division, bringing operations there to a halt.

Still, Jeannette's financial condition deteriorated. By August 1982, sales had fallen to 69% of traditional levels, and by October sales were 44% of 1981 levels. On October 4, 1982, an involuntary bankruptcy petition was filed under Chapter 7 of the Bankruptcy Code.[4] Jeannette's trade creditors filed $2.5 million in proof of claims, over 90% for goods or services provided after June 1982, none for goods or services supplied before the leveraged buyout.

In November 1982, Jeannette sold the assets of its Brookpark division for $1.1 million in cash and notes and the assumption of $62,000 of liabilities. Jeannette's Royal China subsidiary was placed in bankruptcy in 1983, and, a year later, its operating assets were sold for $4.2 million and the assumption of liabilities. Finally, in September 1983, Jeannette's remaining assets were auctioned off for $2.15 million.

## E

On September 22, 1983, plaintiff James Moody, the trustee of the bankruptcy estate of Jeannette, filed this action in federal district court against defendants Security Pacific, Coca–Cola, KNY Development, J. Corp., M–K Candle, Brogan, and other individuals. He alleges that the leveraged buyout constitutes a fraudulent conveyance under the UFCA, 39 Pa.Cons.Stat.Ann.

---

**4.** The bankruptcy case was converted to a voluntary case under Chapter 11 of the Bankruptcy Code in December 1982, with Jeannette as the debtor-in-possession, and James Moody was appointed trustee. On May 1, 1990, however, the district court reconverted the bankruptcy case to a Chapter 7 case.

§§ 354–57, and is voidable under § 544(b) of the Bankruptcy Code, 11 U.S.C. § 544(b).[5] After a bench trial, the district court made findings of fact and conclusions of law and entered judgment for defendants.

According to the district court, the leveraged buyout was not intentionally fraudulent because it was "abundantly clear" that defendants expected the transaction to succeed and hoped to profit from it. *Moody*, 127 B.R. at 990. Likewise, although the leveraged buyout was made for less than fair consideration to Jeannette, the district court held that it was not constructively fraudulent.

Because the leveraged buyout was made for less than fair consideration, the district court placed on defendants the burden of proving solvency by clear and convincing evidence. *Id.* at 992–93. The court, however, concluded that defendants met this burden. Jeannette was not rendered insolvent in the "bankruptcy sense" because the "present fair salable value" of Jeannette's assets immediately after the leveraged buyout exceeded total liabilities by at least $1–2 million. *Id.* at 995. In making this determination, the district court valued assets on a going concern basis. *Id.*

Nor was Jeannette rendered insolvent in the "equity sense" or left with an unreasonably small capital. *Id.* at 996. Based on the parties' projections, which it found "reasonable and prudent when made," and the availability on Jeannette's line of credit with Security Pacific, the district court found that Jeannette was not left with an unreasonably small capital after the acquisition. *Id.* at 984. Rather than a lack of capital, the district court attributed Jeannette's demise to intense foreign and domestic competition, a continued recession, and, to a lesser degree, mismanagement, which led to a drastic decline in sales beginning in early 1982. *Id.* at 989.

After entry of judgment, plaintiff moved for final judgment under Fed.R.Civ.P. 54(b), which the district court granted. This appeal followed.

## II

We have jurisdiction under 28 U.S.C. § 1291. The principal question is whether the leveraged buyout of Jeannette constitutes a fraudulent conveyance under the UFCA. In deciding this question, we must address whether the leveraged buyout was made for less than fair consideration to Jeannette; whether the leveraged buyout either rendered Jeannette insolvent or left it with an unreasonably small capital; and whether defendants entered into the leveraged buyout with an intent to defraud creditors of Jeannette.

---

**5.** Section 544(b) of the Bankruptcy Code provides that "[t]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under *applicable law* by a creditor holding an unsecured claim...." 11 U.S.C. § 544(b) (emphasis added). The "applicable law" here is the UFCA, and it is clear that there is an unsecured creditor into whose shoes plaintiff trustee may step. *See Moody*, 127 B.R. at 989 n. 6.

Plaintiff also alleges that the leveraged buyout is voidable under the fraudulent conveyance provisions of the Bankruptcy Code, 11 U.S.C. §§ 548–549, and that certain defendants engaged in an unlawful dividend and/or distribution of Jeannette's assets under the Pennsylvania Business Corporations Law, 15 Pa.Stat.Ann. §§ 1701–02, superseded by 15 Pa.Cons.Stat.Ann. § 1552–53. After concluding that the transaction did not constitute a fraudulent conveyance under the UFCA, however, the district court summarily rejected these claims. It reasoned that, because the fraudulent conveyance provisions of the Bankruptcy Code are modeled after and typically interpreted in conjunction with those of the UFCA, it follows that if the leveraged buyout is not fraudulent under the UFCA, it is not fraudulent under § 548 of the Bankruptcy Code. And if the transaction does not constitute a fraudulent conveyance under § 548, it is not voidable as an "unauthorized" transfer under § 549. Likewise, if Jeannette was not rendered insolvent by the leveraged buyout, no unlawful dividend and/or distribution of assets could have occurred under §§ 1701 and 1702 of the Pennsylvania Business Corporations Law because those provisions proscribe transfers of shares and dividends made by insolvents. *See id.* at 999–1000.

We agree with the district court's analysis of plaintiff's federal bankruptcy and unlawful dividend and/or distribution of assets claims. Accordingly, because we conclude that the leveraged buyout does not constitute a fraudulent conveyance under the UFCA, we do not address these claims.

■ Our review of the district court's interpretation and construction of the UFCA is plenary. *Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 211 (3d Cir.1990). In applying the UFCA, we are bound by Pennsylvania law. *United States v. Gleneagles Inv. Co.*, 565 F.Supp. 556, 573 (M.D.Pa.1983), *aff'd in part and vacated in part sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986), *cert. denied sub nom. McClellan Realty Corp. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). Where Pennsylvania law is silent, we may look to the law in other jurisdictions that have adopted the UFCA, *id.* (citing 39 Pa.Stat.Ann. § 362), and decisions construing analogous provisions of the Bankruptcy Code, *Tabor Court Realty Corp.*, 803 F.2d at 1298–99.

■ We review the district court's findings of fact under the clearly erroneous standard, *Voest–Alpine Trading USA Corp.*, 919 F.2d at 211, and will accept these findings unless they are "completely devoid of a credible evidentiary basis or bear[ ] no rational relationship to the supporting data," *American Home Prods. Corp. v. Barr Lab., Inc.*, 834 F.2d 368, 371 (3d Cir.1987). "In Pennsylvania, the existence of actual intent is a question of fact." *Tabor Court Realty Corp.*, 803 F.2d at 1304. The question of fair consideration is also a question of fact.

■ We review whether the leveraged buyout rendered Jeannette insolvent as a mixed question of law and fact. *Id.* at 1303. We review the findings underlying the district court's solvency analysis, including the values it assigned to particular items of Jeannette's PP & E, under the clearly erroneous standard. However, our review of the district court's application of the UFCA to these findings, including its decision to value Jeannette's assets on a going concern basis, is plenary.

■ Likewise, adequacy of capital presents a mixed question of law and fact. Our review whether the district court properly considered availability of credit in determining whether the leveraged buyout left Jeannette with an unreasonably small capital is plenary. However, we review the findings underlying its adequacy of capital analysis under the clearly erroneous standard. *See Barrett v. Continental Ill. Nat'l Bank & Trust*, 882 F.2d 1, 4 (1st Cir.1989), *cert. denied*, 494 U.S. 1028, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990).

## III

### A

The UFCA proscribes both intentional and constructive fraud. Under the Act's intentional fraud provisions, any conveyance made or obligation incurred either without fair consideration by one who "intends or believes that he will incur debts beyond his ability to pay as they mature," 39 Pa.Stat.Ann. § 356,[6] or with an "actual intent ... to hinder, delay, or defraud ... creditors" is fraudulent, *id.* § 357.[7] Actual intent to defraud may be inferred from the circumstances surrounding a transfer. *Tabor Court Realty Corp.*, 803 F.2d at 1304–05.

■ The UFCA's constructive fraud provisions operate without regard to intent. Under § 4, any conveyance made or obligation incurred "by a person who is or will be thereby rendered insolvent" is fraudulent if it is made or incurred for less than fair consideration. 39 Pa.Stat.Ann. § 354.[8]

---

**6.** § 356. Conveyances by a person about to incur debts

Every conveyance made and every obligation incurred without fair consideration, when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.
39 Pa.Stat.Ann. § 356.

**7.** § 357. Conveyances made with the intent to defraud

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.
39 Pa.Stat.Ann. § 357.

**8.** § 354. Conveyances by insolvent

Insolvency has two components under Pennsylvania law: insolvency in the "bankruptcy sense" (a deficit net worth immediately after the conveyance), and insolvency in the "equity sense" (an inability to pay debts as they mature). *Larrimer v. Feeney*, 411 Pa. 604, 192 A.2d 351, 353 (1963). Fair consideration requires a "good faith" exchange of "a fair equivalent." 39 Pa. Stat.Ann. § 353(a).

Under § 5, any conveyance made or obligation incurred by a person engaged in "a business or transaction" is fraudulent if it is made or incurred without fair consideration and leaves that person with an "unreasonably small capital." *Id.* § 355.[9] The relationship between "insolvency" under § 4 of the UFCA and "unreasonably small capital" under § 5 is not clear. However, as we discuss below, the better view would seem to be that "unreasonably small capital" denotes a financial condition short of equitable insolvency. The UFCA's constructive fraud provisions furnish a standard of causation that attempts to link the challenged conveyance with the debtor's bankruptcy.

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.
> 39 Pa.Stat.Ann. § 354.

**9.** § 355. Conveyances by persons in business

Every conveyance made without fair consideration, when the person making it is engaged, or is about to engage, in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors, and as to other persons who become creditors during the continuance of such business or transaction, without regard to his actual intent.
39 Pa.Stat.Ann. § 355.

**10.** In *Tabor Court Realty Corp.* we upheld the district court's determination that certain mortgages executed in connection with a leveraged buyout constituted fraudulent conveyances under the UFCA. We noted that "[t]he Act's broad language ... extends to any 'conveyance' which is defined as 'every payment of money ... and also the creation of any lien or incumbrance,'" and declined to exempt from the fraudulent conveyance laws the leveraged buyout chal-

■ At first, the applicability of the UFCA's fraudulent conveyance provisions to leveraged buyouts was a matter of some dispute. *See* Note, *Fraudulent Conveyance Law and Leveraged Buyouts*, 87 Colum.L.Rev. 1491, 1510–13 (1987) (reviewing arguments for and against subjecting leveraged buyouts to fraudulent conveyance laws). However, we think it settled, as a general matter at least, that the fraudulent conveyance provisions of the UFCA extend to leveraged buyouts,[10] and defendants do not contest their applicability here.

Because of the difficulty in proving intentional fraud, challenges to leveraged buyouts tend to be predicated on the constructive fraud provisions of the UFCA. *See* Cieri *et al.*, *supra* note 2, at 353. In the few instances in which leveraged buyouts have been set aside under the Act's intentional fraud provisions, an intent to defraud has been inferred from the circumstances surrounding the transaction. *See, e.g., Gleneagles Inv. Co.*, 565 F.Supp. at 582–83, *aff'd in relevant part sub nom. Tabor Court Realty Corp.*, 803 F.2d at 1304–05. Accordingly, the question wheth-

lenged there simply because it was "innovative" or "complicated." "If the UFCA is not to be applied to leveraged buyouts," we said, "it should be for the state legislatures, not the courts, to decide." 803 F.2d at 1297. *Cf. Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d at 644–46 (holding that the fraudulent conveyance provisions of the Bankruptcy Code are applicable to leveraged buyouts).

This conclusion is consistent with that reached by the other courts that have considered the applicability of the fraudulent conveyance provisions of the UFCA to leveraged buyouts. *See, e.g., Aluminum Mills Corp. v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 885 (Bankr.N.D.Ill.1991); *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 998 (S.D.N.Y.1991); *Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370 (Bankr.D.Mass.1991); *Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.)*, 91 B.R. 430, 433–34 (Bankr.N.D.Ohio 1988); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 499–500 (N.D.Ill.1988). *But cf. Kupetz v. Wolf*, 845 F.2d 842, 848 (9th Cir.1988) (declining to analyze leveraged buyout under the *constructive* fraud provisions of the California UFCA on the theory that it would be "inappropriate to utilize constructive intent to brand most, if not all, LBOs as illegitimate").

er a leveraged buyout constitutes a fraudulent conveyance will typically turn on application of the UFCA's constructive fraud provisions.

With these general principles in mind, we turn now to an analysis of the leveraged buyout of Jeannette under the constructive and then intentional fraud provisions of the UFCA.

### B

### 1

According to the district court, the leveraged buyout was without fair consideration to Jeannette because, in exchange for granting Security Pacific security interests in all its assets and undertaking an $11.7 million demand obligation at 3¼% above prime, all Jeannette received was new management and access to credit. *Moody*, 127 B.R. at 992. Defendants do not challenge this finding, and we accept it for purposes of our analysis here. *Cf. Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 646 (3d Cir.1991), *cert. denied sub nom. Committee of Unsecured Creditors v. Mellon Bank, N.A.*, — U.S. ——, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992) ("The target corporation ... receives no direct benefit to offset the greater risk of now operating as a highly leveraged corporation.").

The district court's allocation of the burden of proving solvency is a different matter. Defendants assert that if the burden of proof shifts upon a showing of no fair consideration, it should be by a preponderance of the evidence. This position is contrary to the Pennsylvania cases relied on by the district court, which apply the clear and convincing evidence standard. *See, e.g., Baker v. Geist*, 457 Pa. 73, 321 A.2d 634, 637 (1974); *First Nat'l Bank v. Hoffines*, 429 Pa. 109, 239 A.2d 458, 462 (1968). Defendants, however, contend these cases are inapposite because they involved "intrafamilial transfers."

Because leveraged buyouts are consummated between distinct corporate entities at arm's length, defendants assert that the potential for collusion and concealment is less than in intrafamilial transfers and, therefore, judicial scrutiny should be less searching. However, the stakes are higher in the typical leveraged buyout, and, at least from the perspective of unsecured creditors, the potential for abuse is great. As we noted in *Mellon Bank, N.A.*:

> The effect of an LBO is that a corporation's shareholders are replaced by secured creditors. Put simply, stockholders' equity is supplanted by debt. The level of risk facing the newly structured corporation rises significantly due to the increased debt to equity ratio. This added risk is borne primarily by the unsecured creditors, those who will most likely not be paid in the event of insolvency.

945 F.2d at 646. *See also* Queenan, *The Collapsed Leveraged Buyout and the Trustee in Bankruptcy*, 11 Cardozo L.Rev. 1, 3–5 (1989) (discussing the risks inherent in leveraged buyout transactions). Accordingly, we do not believe the Pennsylvania Supreme Court would scrutinize leveraged buyouts less closely than intrafamilial transfers.[11]

Although we are inclined to hold that the Pennsylvania Supreme Court would impose the same burden on defendants in leveraged buyouts as that imposed in intrafamilial transfers, we need not decide the issue here because we conclude that defendants have met even the clear and convincing evidence standard. Similarly, because we conclude that defendants have proven adequacy of capital by clear and convincing evidence, we need not decide the standard applicable to defendants' burden of proving adequacy of capital.[12]

### 2

We turn now to the thrust of plaintiff's attack, the district court's solvency and adequacy of capital analyses. As we have discussed, under § 4 of the UFCA a

---

11. Judge Nygaard would conclude that the preponderance of evidence standard applies to defendant's burden.

12. We believe, however, that the same standard of proof applies to defendants' burden of proving adequacy of capital as applies to defendants' burden of proving solvency.

**1066** 

conveyance is fraudulent if it is made without fair consideration and renders the transferor insolvent. *See* Pa.Stat.Ann. § 354. "A person is insolvent when the *present, fair, salable value* of his assets is less than the amount that will be required to pay his probable liability on his existing debts *as they become absolute and matured."* *Id.* § 352(1) (emphasis added). The Pennsylvania Supreme Court has interpreted this provision as requiring solvency in both the "bankruptcy" and "equity" sense, *Larrimer v. Feeney,* 192 A.2d at 35.[13] Insolvency is determined "as of the time of the conveyance." *Angier v. Worrell,* 346 Pa. 450, 31 A.2d 87, 89 (1943).

 The district court valued Jeannette's assets on a going concern basis and found that immediately after the leveraged buyout the present fair salable value of Jeannette's total assets was at least $26.2–$27.2 million (of which $5–6 million comprised PP & E). It then found that the company's total liabilities were $25.2 million. *Moody,* 127 B.R. at 982. Thus, the district court concluded that Jeannette was solvent in the bankruptcy sense "by at least $1–2 million and most probably by more, given the conservative value ... assigned Jeannette's PP & E." *See id.*[14]

At trial, plaintiff argued that Jeannette was rendered insolvent in the bankruptcy

13. The *Larrimer* court stated:

A reasonable construction of the foregoing statutory definition of insolvency indicates that it not only encompasses insolvency in the bankruptcy sense i.e. a deficit net worth, but also includes a condition wherein a debtor has insufficient presently salable assets to pay existing debts as they mature [i.e. insolvency in the equity sense]. If a debtor has a deficit net worth, then the present salable value of his assets must be less than the amount required to pay the liability on his debts as they mature. A debtor may have substantial paper net worth including assets which have a small

salable value, but which if held to a subsequent date could have a much higher salable value. Nevertheless, if the *present* salable value of assets are less than the amount required to pay existing debts as they mature the debtor is insolvent.

192 A.2d at 353 (emphasis in original) (citing *Fidelity Trust Co. v. Union Nat'l Bank,* 313 Pa. 467, 169 A. 209 (1933), *cert. denied,* 291 U.S. 680, 54 S.Ct. 530, 78 L.Ed. 1068 (1934)).

14. The district court found that the balance sheet accounts of Jeannette immediately before and after the July 31, 1981 transaction were as follows:

| Assets | | Before | After |
|---|---|---|---|
| Cash | $ | 265,000 | $ 265,000 |
| Net accounts receivable | | 7,929,000 | 8,300,000 |
| Inventory | | 14,370,000 | 12,200,000 |
| Intercompany accounts | | 519,000 | 0 |
| Other current assets | | 46,000 | 46,000 |
| Total current assets | $ | 23,129,000 | $21,225,000 |
| PP & E | | 17,731,000 | *5,000,000 |
| Goodwill | | 11,377,000 | 0 |
| Other assets | | 119,000 | 119,000 |
| Total assets | $ | 52,356,000 | *$26,344,000 |
| Liabilities | | | |
| Accounts payable | **$ | 2,964,000 | $ 3,100,000 |
| Current portion, long-term debt | | 500,000 | 500,000 |
| Accrued liabilities | | 4,168,000 | 4,340,000 |
| Current liabilities | $ | 7,632,000 | $ 7,940,000 |
| Long-term debt | | 1,856,000 | ***13,567,000 |
| Accrued pensions | | 2,441,000 | 3,700,000 |
| Total liabilities | $ | 11,929,000 | $25,207,000 |

NET WORTH ................................$ 40,427,000 ....................*$ 1,137,000

\* As we have noted, the district court assigned a value of $5–6 million to Jeannette's PP & E. The figures denoted by the single asterisk assume a $5 million figure.

\*\* This figure includes the $140,000 of acquisition costs incurred by Jeannette in connection with the July 31, 1981 transaction.

\*\*\* This figure includes the $11,711,000 Jeannette owed to Security Pacific on the initial advance from the revolving credit facility to J. Corp. As we have noted, this obligation was payable on demand, and therefore could be characterized as a current liability, but the parties viewed it as long-term debt and Jeannette carried it on its books as such. *See Moody,* 127 B.R. at 978–82.

sense because the present fair salable value of Jeannette's total assets could not have exceeded the $12.1 million J. Corp. paid for Jeannette's stock. *Id.* at 994 n. 10. The district court rejected this argument and undertook its own valuation of Jeannette's assets. We find no error here. Although purchase price may be highly probative of a company's value immediately after a leveraged buyout, it is not the only evidence. *Cf. Mellon Bank, N.A.,* 945 F.2d at 649 (rejecting as "cavalier" valuation of target's assets solely on the basis of amount paid to company's former shareholders). The parties here viewed the $12.1 million purchase price as a "significant bargain," made possible by Coca-Cola's decision to focus attention on its bottling business and Brogan's ability to close the deal quickly. *Moody,* 127 B.R. at 970.

On appeal, plaintiff focuses on the district court's valuation of Jeannette's PP & E. He argues that the district court erred in valuing Jeannette's PP & E on a going concern basis because these assets were not "presently salable" at the time of the leveraged buyout. In addition, he asserts that the $5–6 million the district court assigned Jeannette's PP & E is unsupported by the record. If the district court overstated Jeannette's PP & E by more than $1 million, the company is left with a deficit net worth and we must find that Jeannette was rendered insolvent in the bankruptcy sense.

To be "salable" an asset must have "an existing and not theoretical market." *Gleneagles Inv. Co.,* 565 F.Supp. at 578. *See also* Rosenberg, *Intercorporate Guaranties and the Law of Fraudulent Conveyances: Lender Beware,* 125 U.Pa. L.Rev. 235, 255 (1976). Jeannette's PP & E, which comprised real estate and machinery used in the production of glass and

pottery, was not highly liquid. Therefore, in determining the present fair salable value of Jeannette's PP & E, the time frame in which these assets must be valued is critical.

Plaintiff argues that valuation on a going concern basis fails to give effect to "present" in the UFCA's "present fair salable value" language, *see* 39 Pa.Stat.Ann. § 352(1), and the district court should have calculated the amount the company would have received had it attempted to liquidate its PP & E on the date of the acquisition or immediately thereafter. We disagree. Where bankruptcy is not "clearly imminent" on the date of the challenged conveyance, the weight of authority holds that assets should be valued on a going concern basis. *See, e.g., In re Taxman Clothing Co.,* 905 F.2d 166, 169–70 (7th Cir.1990) (under Bankruptcy Code going concern valuation is proper unless "business is on its deathbed"); *Kupetz v. Continental Ill. Nat'l Bank & Trust Co.,* 77 B.R. 754, 763 (C.D.Cal.1987) (valuing assets on going concern basis under UFCA), *aff'd sub nom. Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.),* 100 B.R. 127, 131 (Bankr.D.Mass.1989) ("The proper standard of valuation to be applied in determination of solvency in a bankruptcy proceeding is the value of the business as a going concern, not the liquidation value of its assets less its liabilities."); *Fryman v. Century Factors, Factor for New Wave (In re Art Shirt Ltd.),* 93 B.R. 333, 341 (E.D.Pa.1988) (under Bankruptcy Code assets should be valued on going concern basis unless company is "on its deathbed").[15]

Although most of these cases involve application of the Bankruptcy Code, we have previously looked to the federal bankruptcy laws in interpreting the UFCA. As

**15.** *See also 2 Collier on Bankruptcy* ¶ 101.32[5] (15th ed. 1991) ("overwhelming authority" supports the proposition that assets should be valued on a going concern basis under Bankruptcy Code except where target "was already defunct at the critical date"); Queenan, *supra,* at 15

("[T]he question of a debtor's solvency as of a particular date is determined under a going concern standard of valuation, provided that the debtor was then operating the business as a going concern.").

we noted in *Tabor Court Realty Corp.*, "[t]he fraudulent conveyance provisions of the [Bankruptcy] Code are modeled on the UFCA, and uniform interpretation of the two statutes [is] essential to promote commerce nationally." 803 F.2d at 1298–99 (citing *Cohen v. Sutherland*, 257 F.2d 737, 741 (2d Cir.1958)) (internal quotations omitted). Thus, although the UFCA's "present fair salable value" language differs from the Bankruptcy Code's "fair valuation" requirement, *see* 11 U.S.C. § 101(31)(A), we find the bankruptcy cases instructive on the proper valuation standard here. *See* Cieri *et al.*, *supra* note 2, at 361 ("The UFCA's 'present fair salable value' and the Bankruptcy Code and UFTA's 'fair valuation' probably should be viewed as interchangeable standards for valuing an LBO's target's assets.").

Moreover, we think valuation on a going concern basis strikes the proper balance between "present" and "fair" in the UFCA's "present fair salable value" language. *See* 39 Pa.Stat.Ann. § 352(1). The approach set forth in *United States v. Gleneagles Investment Co.* is instructive. There the district court valued the debtor's assets, which included mining and coal processing equipment, according to the amount that would have been obtained if they were "liquidated with reasonable promptness in an arms-length transaction in an existing and not theoretical market." 565 F.Supp. at 578. *See also Fraudulent Conveyance Law and Leveraged Buyouts*, *supra*, at 1505 n. 113.[16]

As plaintiff points out, the Pennsylvania Supreme Court applied a more immediate valuation standard in *Fidelity Trust Co. v. Union National Bank*, 313 Pa. 467, 169 A. 209 (1933). Although recognizing that "market value of an asset is generally controlling," it held that the trial court erred in declining to consider the *"actual* value" of stock subject to the debtor's speculation scheme on the date of the challenged conveyance. *Id.* at 213 (emphasis in original).[17] The district court here concluded that *Fidelity Trust Co.* "stands for the proposition that we may not ignore the economic realities of the transfer before us," and, therefore, does not compel valuation on a liquidation basis in every instance. *Moody*, 127 B.R. at 995. We agree.

To determine whether the district court properly valued Jeannette's PP & E on a going concern basis, then, we must ascer-

---

**16.** There is also some support for the application of a going concern valuation standard in the Pennsylvania Business Corporations Law. Section 1551 prohibits shareholder distributions "if, after giving effect thereto: (1) the corporation would be unable to pay its debts as they become due in the usual course of business; or (2) the total assets of the corporation would be less than the sum of its total liabilities...." 15 Pa.Cons.Stat.Ann. § 1551(b). The commentary to § 1551 provides:

No particular method of valuation is prescribed in the statute, since different methods may have validity depending upon the circumstances, including the type of enterprise and the purpose for which the determination is made. For example, it is inappropriate in most cases to apply a "quick-sale liquidation" method to value an ongoing enterprise, particularly with respect to the payment of normal dividends. On the other hand, a "quick-sale liquidation" valuation method might be appropriate in certain circumstances for an enterprise in the course of reducing its asset or business base by a material degree. In most cases, a fair valuation method or a going-concern basis would be appropriate if it is believed that the enterprise will continue as a going concern.

*Id.* cmt. 2(b). This commentary is at least instructive on how the Pennsylvania General Assembly views the proper valuation of assets in the case of a transfer (*i.e.*, shareholder distribution) alleged to have rendered a corporation insolvent.

**17.** In *Fidelity Trust Co.* the debtor, a bank president, was engaged in unlawful speculation in the bank's stock. He owned a large number of shares of the bank's stock, which he had pledged as security for demand obligations of his own. At the time of the challenged transfer, he was attempting to inflate the market value of bank stock by causing the bank to purchase additional shares. The debtor's own solvency was dependent on his ability to manipulate the value of bank stock so that the collateral on his loans would remain secure. Against this backdrop, the Pennsylvania Supreme Court said that it was error for the lower court not to consider the value of the debtor's shares of bank stock on the date of the challenged conveyance, as opposed to the amount he would have received for the stock had he sold it at some point later in time to take advantage of his stock manipulation efforts. *See* 169 A. at 212–13.

tain whether Jeannette was either insolvent or on the brink of insolvency on the date of the leveraged buyout. The district court found that "Jeannette was not a company whose failure was clearly imminent on July 31, 1981." *Moody,* 127 B.R. at 995. This conclusion is supported by the record. Prior to the transaction, Jeannette had a net worth of over $40 million. *See supra* note 14. Moreover, at the time of the transaction Jeannette had a positive cash flow and was coming off a break-even year before acquisition costs. Accordingly, we think the district court properly valued Jeannette's assets, and, in particular, its PP & E, on a going concern basis.

■ Plaintiff also maintains that the district court erred in finding that the present fair salable value of Jeannette's PP & E on the date of the acquisition was $5–6 million. At trial, plaintiff presented no evidence on the going concern value of Jeannette's PP & E, or any other assets, because he argued that the company could not be worth more than the amount J. Corp. paid for Jeannette's stock. Plaintiff now asserts that the district court used a "hodgepodge of irrelevant numbers" to arrive at the $5–6 million figure it set for Jeannette's PP & E. We disagree. The record supports the district court's finding that the present fair salable value of Jeannette's PP & E on the date of the acquisition was at least $5–6 million and probably more.

The district court arrived at its $5–6 million figure after finding that: (1) Jeannette assigned its PP & E a book value of $17.7 million on the date of the leveraged buyout; (2) in 1978 a manufacturer's appraisal of Jeannette's assets valued PP & E at $29 million; (3) Coca–Cola invested $11 million in capital improvements and repairs of PP & E; (4) defendants' expert valued Jeannette's PP & E on the date of the acquisition at $12.7 million; and (5) Jeannette received $5.65 million for PP & E in selling off its component parts after the financial downturn ($1.3 million for PP & E at its Old Harbor subsidiary, $550,000 for real property at its Brookpark division, $2 million for PP & E at its Royal China subsidiary, and $1.8 million for PP & E at its Jeannette Glass division).

We find the $5.65 million Jeannette received for PP & E in liquidating its divisions and subsidiaries particularly probative of the going concern value of Jeannette's PP & E on July 31, 1981 because these components were sold as going concerns on something approaching a liquidation basis. Therefore, although these assets were sold long after the leveraged buyout, the conditions under which they were sold approximated, and may have been more immediate than, that required by the UFCA's "present fair salable value" language.[18] Accordingly, we conclude that the district court did not err in finding that Jeannette was solvent in the bankruptcy sense after the leveraged buyout.

3

■ Next, we look at whether the leveraged buyout either rendered Jeannette insolvent in the equity sense or left it with an unreasonably small capital. Although it recognized that these issues were "conceptually distinct," the district court considered them together. *Moody,* 127 B.R. at 996. Plaintiff contends this was improper because "unreasonably small capital" denotes a financial condition short of equitable insolvency.

■ As we have discussed, under § 5 of the UFCA any conveyance made or obligation incurred by a person engaged in "a business or transaction" is fraudulent if it is made or incurred without fair consideration and leaves that person with an "unreasonably small capital." 39 Pa.Stat.Ann.

---

**18.** Citing *Gruber v. Owens–Illinois Inc.,* 899 F.2d 1366, 1370 (3d Cir.1990), plaintiff argues that the district court erred in considering the amounts Jeannette received for the PP & E of its Old Harbor and Royal China subsidiaries because ownership of a subsidiary's stock does not constitute ownership of its assets. However, as defendants point out, although ownership of a subsidiary's stock may not constitute ownership of its property, evidence of the value of a company's property is admissible to establish the value of its stock. *Wagoner v. Wallace Turnbull Corp. & Lumber Terminals, Inc.,* 160 A. 105, 170 (1932) (citing *Jarvis v. Bell,* 296 Pa. 568, 146 A. 153 (1929)). We find no error here.

§ 355. Unlike "insolvency," "unreasonably small capital" is not defined by the UFCA. This has engendered confusion over the relationship between these concepts: some courts have equated a finding of equitable insolvency with that of unreasonably small capital,[19] whereas others have said that unreasonably small capital encompasses financial difficulties short of equitable insolvency.[20]

We believe the better view is that unreasonably small capital denotes a financial condition short of equitable insolvency. As plaintiff points out, there is some support for this position in *Fidelity Trust Co. v. Union National Bank*, discussed *supra* note 17, where the Pennsylvania Supreme Court said that "insolvency at the time" of the challenged conveyance is "of no moment" under § 5. 169 A. at 215.[21]

Moreover, we think it telling that having adopted § 4 of the UFCA, which proscribes conveyances made without fair consideration that render the debtor "insolvent," the drafters saw fit to add § 5, which proscribes conveyances made without fair consideration that leave the debtor with an "unreasonably small capital." If the draft-

ers viewed these concepts interchangeably, one would expect them to have employed the same language. *Cf. In re Vadnais Lumber Supply Co.*, 100 B.R. at 137 (noting that if Congress had intended to equate unreasonably small capital with equitable insolvency under § 548 of the Bankruptcy Code it would not have used different terms).

Finally, whereas § 4 covers conveyances by persons generally, § 5 covers conveyances by "persons in business." *See* 39 Pa.Stat.Ann. § 355 (heading). In the business setting, "capital" is a term of art. As a general matter, it refers to "[a]ccumulated goods, possessions, and assets, used for the production of profits and wealth." *Black's Law Dictionary* 189 (5th ed. 1979). Viewed in this light, an "unreasonably small capital" would refer to the inability to generate sufficient profits to sustain operations. Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable solvency.[22]

---

**19.** *See, e.g., Gleneagles Inv. Co.*, 565 F.Supp. at 580 ("[A] finding of insolvency is *ipso facto* a finding that the debtor was left with unreasonably small capital after the conveyance."). We did not address the issue of unreasonably small capital in *Tabor Court Realty Corp.*

**20.** *See, e.g., Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 Bankr. 370, 407 (Bankr.D.Mass. 1991) ("It must be remembered that '[u]nreasonably small capitalization need not be so extreme a condition of financial debility as to constitute equitable insolvency....'") (quoting Queenan, *supra*, at 18); *In re Vadnais Lumber Supply, Inc.*, 100 B.R. at 137 ("Unreasonably small capitalization ... encompasses difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some point in the future.").

**21.** The *Fidelity Trust Co.* court stated:

Considered in another aspect, the transaction is condemned by section 5 (39 P.S. § 355) *under which neither intent nor insolvency at the time is of the moment.* If the donor were considered solvent in October, 1929, his surplus must have been too small for the conduct of his speculative business. With his property pledged, ... possibility of continued operations depended on the manipulation of equities in a wildly fluctuating stock market. The precarious chance of successful issue of busi-

ness conducted with such slender margin must be considered and would warrant finding that conduct was fraudulent.

169 A. at 215 (emphasis added).

**22.** One commentator has explained the difference between the notions of insolvency and that of unreasonably small capital under the UFCA as follows:

The second requirement [of § 5] can most easily be seen as an analogue to § 4 of the UFCA dealing with transfers by insolvents. The objective of § 4 was creditor protection by requiring the transferor to retain sufficient assets to meet all debts. Yet ... many debtors took advantage of the vagaries surrounding asset valuation and difficulties regarding proof of intent, and left themselves solvent, but just barely so. Section 5 of the UFCA was an attempt to close these gaps. It imposes an additional burden on transferors; they must not leave themselves with unreasonably small—or inadequate—capital or reserves.

Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital,* 21 Ind.L.Rev. 469, 498 (1988). *See also* Queenan, *supra*, at 18 (discussing the relationship between the concepts of unreasonably small capital and equitable solvency under the UFCA).

In any event, we do not think the district court erred in considering whether the leveraged buyout left Jeannette with an unreasonably small capital in conjunction with whether it rendered the company equitably insolvent. These distinct but related concepts furnish a standard of causation which looks for a link between the challenged conveyance and the debtor's insolvency. Moreover, where the debtor is a corporation, adequacy of capital is typically a major component of any solvency analysis. This is true of the district court's analysis here.

### 4

■ In undertaking its adequacy of capital analysis, the district court focused on the reasonableness of the parties' projections, but also considered the availability on Jeannette's line of credit with Security Pacific. It found the parties' projections reasonable and, based on the availability of credit as well as the company's historical cash flow needs, determined that Jeannette was not left with an unreasonably small capital under the circumstances. *Moody,* 127 B.R. at 998. Rather than a lack of capital, the district court attributed Jeannette's demise to the "substantial drop in orders and sales that began in 1982," which it attributed in turn to increased foreign and domestic competition and the continued recession. *Id.* at 989.

Because creditors cannot execute on a debtor's ability to borrow, plaintiff maintains that the district court erred in considering Jeannette's line of credit with Security Pacific in undertaking its adequacy of capital analysis. He relies on *Larrimer v.*

*Feeney,* 192 A.2d at 353, and *Fidelity Trust Co. v. Union National Bank,* 169 A. at 215, where the Pennsylvania Supreme Court said that the ability to survive on borrowed funds does not render an individual debtor solvent for purposes of § 4 of the UFCA. The district court found these cases inapposite. We agree.

*Larrimer* and *Fidelity Trust Co.* involved individual debtors who had engaged in speculative stock trading schemes and borrowed funds to stay afloat.[23] In *Larrimer* the Pennsylvania Supreme Court observed that the debtor's "sanguine expectations that the stock market would fluctuate sufficiently [to cover his losses] were in vain," 192 A.2d at 354; and in *Fidelity Trust Co.* the court referred to the debtor's stock manipulation efforts as "highly speculative" and "unlawful," 169 A. at 212. By contrast, defendants' decision to enter into the lending arrangement challenged here was predicated on their projections that the acquisition would succeed, and, as we discuss below, these projections were reasonable.

Moreover, unlike the debtors in *Larrimer* and *Fidelity Trust Co.*, at least initially, Jeannette did not borrow funds to stay afloat. As we have noted, the company was solvent by $1–2 million immediately after the leveraged buyout. Finally, we think the lending relationship here is different in important respects from those in *Larrimer* and *Fidelity Trust Co.* Jeannette granted Security Pacific first priority security interests in all its assets, which the district court valued at $26 million, to secure a $15.5 million line of credit to provide Jeannette with working capital in the

---

**23.** The debtor in *Larrimer* borrowed money from customers to invest in securities, in exchange for which he agreed to pay them a 2% monthly return on their investments. The debtor fell behind in interest payments to some customers but made excessive payments to others. Still, he continued to "borrow[ ] money at interest rates in excess of the legal rate in order to keep his head above water." 192 A.2d at 353. Eventually, the debtor was unable to meet his debts as they became due and posted a deficit net worth for four successive years. 192 A.2d at 353–54.

As we have discussed, *see supra* note 17, the debtor in *Fidelity Trust Co.* was the president and large stockholder of a bank. He had pledged his bank stock as security on his own demand obligations and, at the time of the challenged transfer, was attempting to inflate the market value of this stock by causing the bank to purchase additional shares. 169 A. at 212–13. As the market value of bank stock fell, the debtor began borrowing to repay his existing demand obligations in "a hopeless struggle to stay afloat." *Id.* at 214.

year following the transaction.[24]

In the absence of controlling Pennsylvania caselaw, it was proper for the district court to look to caselaw in other jurisdictions, and, in particular, *Credit Managers Ass'n v. Federal Co.*, 629 F.Supp. 175 (C.D.Cal.1985). In that case the district court held that the focus of the adequacy of capital inquiry in a leveraged buyout should be the reasonableness of the parties' cash flow projections. In finding that the target corporation was not left with an unreasonably small capital after the leveraged buyout, the court also considered availability of credit. *See id.* at 185–86.[25]

Plaintiff urges us to follow *Murphy v. Meritor Savings Bank (In re O'Day Corp.)*, 126 B.R. 370, 407 (Bankr.D.Mass. 1991),[26] in which the bankruptcy court said that availability of credit alone does not establish adequate capitalization after a leveraged buyout. 126 B.R. at 408. However, this statement is not necessarily at odds with *Credit Managers Ass'n*, which the *In re O'Day Corp.* court explicitly embraced. The *Credit Managers Ass'n* analysis turns on the reasonableness of projections, not availability of credit *per se*. If projections are unreasonable, as was the case in *In re O'Day Corp., see supra* note 26, it will follow that the debtor was left with an unreasonably small capital even though it may not have exhausted its credit.

■ We cannot say that Jeannette was left with an unreasonably small capital merely because after the leveraged buyout its sole source of operating capital was its line of credit with Security Pacific. As we noted in *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d at 647, "[t]he

24. Finally, it is worth noting that, strictly speaking, *Larrimer* and *Fidelity Trust Co.* held that the ability to borrow is not pertinent for purposes of a § 4 solvency analysis, not a § 5 adequacy of capital analysis. As we have explained, in the business setting, where § 5 applies, capital has a special meaning. One commentator has said that "the test for unreasonably small 'capital' should include ... all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period." Markell, *supra* note 22, at 496. The precise definition of "capital" under § 5 of the UFCA is of course open to dispute. However, because the Pennsylvania cases involve the construction of § 4 of the UFCA, they are not controlling for purposes of § 5.

25. *Credit Managers Ass'n* involved a challenge to the failed leveraged buyout of the Crescent Food Company under § 5 of the California UFCA. Despite a $10 million line of credit, less than a year and a half after the acquisition, Crescent had accounts payable of $3 million and insufficient cash flow to continue operations. Although it recognized that the acquisition placed Crescent "heavily in debt," the district court found it "was not undercapitalized and had sufficient *expected* cash flow to stay in business." *Id.* at 184 (emphasis added). In reaching this conclusion, the district court focused on the reasonableness of the lender's cash flow projections *entering into the acquisition, and, to a* degree, the resulting availability on Crescent's line of credit. *Id.* at 186. Rather than a lack of capital, the district court attributed Crescent's demise to a series of unexpected setbacks—in particular, a two-month strike. *Id.* at 178.

26. *In re O'Day Corp.* involved a challenge to the failed leveraged buyout of Prindle Boats Corp. and O'Day/Cal Sail Boats Corp, later merged into The O'Day Corporation. Meritor Savings Bank financed the transaction, which included a $7.2 million loan and $2.5 million revolving credit facility secured by the assets of Prindle and O'Day/Cal. 126 B.R. at 381. Less than two years after the leveraged buyout, O'Day was forced into bankruptcy and the trustee of the bankruptcy estate brought an action alleging that the leveraged buyout was voidable under the UFCA. *Id.* at 372–73.

The bankruptcy court held that the leveraged buyout left O'Day with an unreasonably small capital under § 5 of the UFCA. In reaching this conclusion, it observed:

> In perhaps the leading case on the issue of unreasonably small capital, the court concluded that its task in determining whether a company had sufficient working capital as evidenced by cash flow projections was not to examine what happened to the company but whether the projections employed prior to the LBO were prudent. *Credit Managers*, 629 F.Supp. at 187.

*Id.* at 404. Because the parties' projections did not take into account O'Day's performance prior to the leveraged buyout, the bankruptcy court found them unreasonable. Indeed, as the court noted, they rested in part on the assumption that, "in a *worst case scenario*, O'Day would somehow match or exceed its *best* financial performance of the 1980's." *Id.* at 406 (emphasis in original). "Thus, using the *Credit Managers* test outlined above, the [c]ourt conclude[d] that O'Day was left with unreasonably small capital." *Id.* at 407.

ability to borrow money has considerable value in the commercial world." This is particularly true in the case of leveraged buyouts, which are predicated on the exchange of equity for debt and the ability to borrow. Refusal to consider availability of credit in the adequacy of capital determination would result in a *per se* rule that failed leveraged buyouts are voidable under § 5 of the UFCA.

■ Because a leveraged buyout may fail for reasons other than the structure of the transaction itself, we think the determination whether a leveraged buyout leaves a target corporation with an unreasonably small capital requires a more careful inquiry. At least from the viewpoint of the unsecured creditor, leveraged buyouts present great potential for abuse. As we noted in *Mellon Bank, N.A.*, "[a]n LBO may be attractive to the buyer, seller, and lender because the structure of the transaction ... allow[s] all parties to shift most of the risk of loss to other creditors...." 945 F.2d at 646. *But cf. C–T of Virginia, Inc. v. Barrett (In re C–T Virginia, Inc.)*, 958 F.2d 606, 612–13 (4th Cir.1992).[27] Therefore, we believe failed leveraged buyouts merit close scrutiny under the fraudulent conveyance laws.

■ The *Credit Managers Ass'n* analysis appears to strike a proper balance. It holds participants in leveraged buyout responsible under § 5 of the UFCA when it is reasonably foreseeable that an acquisition will fail, but at the same time takes into account that "businesses fail for all sorts of reasons, and that fraudulent [conveyance] laws are not a panacea for all such failures." Markell, *supra* note 22, at 506. Therefore, we hold the test for unreasonably small capital is reasonable foreseeability. Under this analysis, it was proper for the district court to consider availability of credit in determining whether Jeannette was left with an unreasonably small capital. The critical question is whether the parties' projections were reasonable.

■ Because projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance. Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses. *See Credit Managers Ass'n*, 629 F.Supp. at 184–86. However, reliance on historical data alone is not enough. To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error. *See* Queenan, *supra*, at 19.

■ Defendants here relied on two sets of one-year projections, one prepared by Brogan and the other by Ngan. Brogan's projections were based on a month-by-month analysis of Jeannette's balance sheet, income statement, and resulting credit availability. Ngan's projections were grounded in his interviews with Jeannette personnel and examination of the company's financial records for the year and a half preceding the acquisition. The district court found these projections reasonable and prudent when made. *See Moody*, 127 B.R. at 984. We agree.

Plaintiff contends that Brogan's projections were unreasonable because they did not include a separate set of month-by-month cash flow projections. Yet the record shows that Brogan undertook a detailed month-by-month analysis of Jeannette's ability to handle added debt in the year after the acquisition. Moreover, although Brogan did not prepare a separate month-by-month cash flow analysis, his projections were based in part on Jeannette's business plan for 1981, which projected a $3 million positive cash flow through 1981.

Therefore, although the failure to undertake an independent cash flow analysis will often be unreasonable, we cannot say the

---

**27.** We recognize that certain voluntary creditors may be able to protect themselves against leveraged buyouts through loan agreements. However, not all creditors have the bargaining power to obtain such contractual protection and most creditors are involuntary. *See Tabor Court Realty Corp.*, 803 F.2d at 1297 n. 2.

district court erred in finding Brogan's projections reasonable. This conclusion is bolstered by the fact that during the five months following the leveraged buyout, Jeannette's cash flow tracked the projections contained in company's 1981 business plan.

Plaintiff also asserts that the parties' projections were unreasonable because, like the projections in *In re O'Day Corp.*, they "ignored Jeannette's recent historical experience" and were "founded instead on Brogan's apparent belief that, in the midst of a severe recession, he could suddenly 'turn around' a company which had been losing money for two-and-a-half years." We disagree. As we have discussed, Jeannette was profitable for many years. It suffered a downturn in 1979, but rebounded in 1980. Although 1980 was a break-even year after interest expenses, the company enjoyed a $1.3 million pre-tax profit and had a $3 million positive cash flow. Jeannette projected a continuation of this trend into 1981, and, as of July 14, 1981, was projecting a year's end pre-tax profit of $500,000 before interest expenses.

In hindsight it is clear that the figures employed by Brogan and Ngan were not entirely on the mark. Brogan assumed net sales of $70 million and a gross profit margin of 16.9%; and Ngan assumed net sales of $75 million and a gross profit margin of 17%. However, Ngan's sales projection was based on expected price increases and new product lines and still was $15 million less than that contained in Jeannette's own 1981 business plan. Moreover, although both Brogan's and Ngan's gross profit margins (about 17%) represented a 2.5%

increase over 1980, they were below Jeannette's average gross profit margin from 1965 to 1978 (20%). Therefore, the projections here are different from those found unreasonable in *In re O'Day Corp.*, where the parties' worst case scenario exceeded the company's best financial performance in the preceding years. *See* 126 B.R. at 406.[28]

Finally, Jeannette's actual performance after the acquisition supports the district court's finding that the parties' projections were reasonable. As we have noted, in the five months following the acquisition, Jeannette had a positive cash flow and realized $6 million in gross profits.[29] Of the $2.5 million in proof of claims filed by trade creditors, over 90% were for goods or services provided Jeannette after June 1982; none were for goods or services provided prior to July 31, 1981.[30]

This is not to say that Jeannette did not experience grave financial problems in the wake of the leveraged buyout. As we have discussed, it suffered a build-up of an unusually large inventory, which the district court attributed in part to mismanagement. *Moody*, 127 B.R. at 989. From late 1981 to early 1982, Jeannette's payment period for accounts payable increased from 30 days to 88 days. Less than a year after the acquisition, the company began shutting down operations at its Jeannette Glass division and selling off its subsidiaries. By October 1982, it had gone into bankruptcy.

The district court properly found that Jeannette's failure was caused by a dra-

---

**28.** Ngan thought Brogan's projections were "overly optimistic." However, Brogan's calculations differed from Ngan's, and, as a result, were not as optimistic as Ngan perceived. Brogan accounted for the substantial reduction in annual depreciation expense that would result from his anticipated write down of Jeannette's fixed assets, whereas Ngan based his projections on depreciation levels recorded during Coca–Cola's ownership of Jeannette. Assuming lower depreciation expenses, Brogan's projections were consistent with Jeannette's actual and projected sales and operations up to that point in 1981. *See Moody*, 127 B.R. at 973.

**29.** During this time period, Jeannette's net sales exceeded $31 million. Plaintiff argues that this

figure is misleading because the company had implemented an inventory reduction program in October 1981, where products were sold at 50–60% below list prices. However, only 8% of Jeannette's sales from August through December 1981 comprised inventory moved through this program.

**30.** In addition, as we have discussed, Jeannette's revolving line of credit with Security Pacific remained positive throughout the year after the leveraged buyout. That the availability of credit increased in 1981 and, in the end, was never exhausted is evidence that Jeannette's cash flow remained positive through 1981 and into 1982.

matic drop in sales due to increased foreign and domestic competition, rather than a lack of capital.[31] Plaintiff plausibly contends that defendants should have anticipated some of these problems and incorporated a margin for error. But we cannot say the district court erred in finding that the drastic decline in sales was unforeseeable as of the date of the leveraged buyout. Therefore, we conclude that the district court properly determined that the leveraged buyout did not leave Jeannette with an unreasonably small capital.

Because we assume the notion of unreasonably small capital denotes a financial condition short of equitable insolvency, it follows that the transaction did not render Jeannette equitably insolvent either. And because the leveraged buyout neither left Jeannette with an unreasonably small capital nor rendered it equitably insolvent, we agree with the district court that the acquisition does not constitute a fraudulent conveyance under either §§ 4 or 5 of the UFCA.

## C

All that remains to be decided is whether the district court properly determined that the leveraged buyout did not violate the UFCA's intentional fraud provisions. As we have discussed, a conveyance is intentionally fraudulent if it is made either without fair consideration by one who "intends or believes that he will incur debts beyond his ability to pay as they mature," 39 Pa.Stat.Ann. § 356, or with an "actual intent ... to hinder, delay, or defraud either present or future creditors," id. § 357. Actual intent to defraud need not be shown by direct evidence, but rather may be inferred from the circumstances surrounding a conveyance. *United States v. Tabor Court Realty Corp.*, 803 F.2d at 1304.

The district court found that "defendants did not know or believe that Jeannette's

creditors could not be paid, and did not intend to hinder, defraud, or delay creditors." *Moody*, 127 B.R. at 990. This conclusion followed from the absence of any direct evidence of fraud, as well as defendants' profit motives, the parties' awareness of the transaction's leveraged nature, and Jeannette's operation as a going concern for at least five months following the acquisition. *Id.* at 991.

Plaintiff apparently concedes that there is no direct evidence that defendants intended to defraud Jeannette's creditors. However, he asserts that the district court erred in failing to consider the "well-established principle" that "parties are held to have intended the natural consequences of their acts." Applying this principle, plaintiff reasons that because the leveraged buyout had the foreseeable "effect" of hindering and delaying creditors of Jeannette, it follows that defendants intended to defraud them. We cannot agree.

In *Tabor Court Realty Corp.* we relied in part on the principle that "a party is deemed to have intended the natural consequences of his acts" in upholding the district court's finding of intentional fraud. 803 F.2d at 1305. The facts of that case, however, are more egregious than those here. The target corporation in *Tabor* was "clearly on the brink of insolvency" at the time of the challenged leveraged buyout. *Gleneagles Inv. Co.*, 565 F.Supp. at 581. Thus, the leveraged buyout was not only voidable under the intentional fraud provisions of the UFCA, but also under the Act's constructive fraud provisions.

By contrast, Jeannette was not on the brink of insolvency at the time of the leveraged buyout, and the acquisition was not constructively fraudulent. Therefore, even assuming participants in leveraged buyouts may be held accountable under the intentional fraud provisions of the UFCA for the natural consequences of their actions, we

---

**31.** Plaintiff argues that the dramatic decline in sales was a result of—not the cause of—Jeannette's demise. Although the decline in sales may not have worsened to the point of calamity until summer 1982, the record supports the district court's finding that it began in early 1982.

January and February orders were 86% and 70% of projected levels, and by August sales had dropped to 69% of 1981 levels. Moreover, the intense foreign and domestic competition started in early 1982.

do not believe Jeannette's insolvency was a natural consequence of the leveraged buyout. We conclude, then, that the district court properly held that the leveraged buyout was not intentionally fraudulent.

## IV

In sum, we will affirm the district court's conclusions that the leveraged buyout does not constitute a fraudulent conveyance under either the constructive or intentional fraud provisions of the UFCA. Because the leveraged buyout was without fair consideration to Jeannette, defendants bore the burden of proving that Jeannette was neither rendered insolvent nor left with an unreasonably small capital.

Jeannette was not rendered insolvent in the bankruptcy sense because the present fair salable value of Jeannette's total assets immediately after the leveraged buyout exceeded that of its total liabilities by at least $1–2 million. Because bankruptcy was not clearly imminent on the date of the leveraged buyout, the district court properly valued Jeannette's assets on a going concern basis. In applying this valuation standard, the district court did not err in finding that Jeannette's PP & E was worth at least $5–6 million on July 31, 1981.

Nor was Jeannette rendered insolvent in the equity sense. This follows from the district court's finding that Jeannette was not left with an unreasonably small capital because the concept of unreasonably small capital under § 5 of the UFCA denotes a financial condition short of equitable insolvency under § 4. In analyzing the adequacy of Jeannette's capital after the leveraged buyout, the district court properly considered the availability of Jeannette's line of credit with Security Pacific and focused on the reasonableness of the parties' projections.

The district court found the parties' projections reasonable. We find no error. Both Brogan's and Ngan's projections were based on a historical analysis of Jeannette's performance and a month-by-month assessment of the company's ability to operate successfully in the year following the acquisition. Jeannette's actual performance in the five months after the leveraged buyout supports the finding that defendants' projections were reasonable.

Although prudence dictates incorporation of some margin for error, we agree with the district court that the extent of Jeannette's decline in sales in 1982, resulting from increased foreign and domestic competition, was not foreseeable at the time of the leveraged buyout. Thus, we agree that ultimately Jeannette's failure was caused by the decline in sales rather than a lack of capital.

Finally, the district court did not err in finding that defendants did not intend to defraud creditors of Jeannette. Even assuming that parties are deemed to have intended the natural consequences of their actions, it follows that if Jeannette's demise was not clearly imminent as of the date of the leveraged buyout and the leveraged buyout was not constructively fraudulent, the leveraged buyout was not intentionally fraudulent.

## V

For the foregoing reasons, we will affirm the district court's order entering judgment for defendants.